# EXHIBIT 28



MATTHEW L. SCHWARTZ
Tel.:  (212) 303-3646
E-mail:  mlschwartz@bsfllp.com

December 29, 2017

**BY ELECTRONIC MAIL**

Brian Blais
Andrea Griswold
Aimee Hector
Rebecca Mermelstein
Brendan Quigley
Negar Tekeei
Lisa Korologos
Assistant United States Attorneys
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

  **Re:**  ***United States v. Jason Galanis, et al.*, S1 16 Cr. 371 (RA)**

Dear Brian, Andrea, Aimee, Rebecca, Brendan, Negar, and Lisa:

   As you know, we represent Devon Archer in the above-referenced case.  I write, in advance of the motions deadline and pursuant to Local Criminal Rule 16.1, to request that the government provide Mr. Archer with the disclosures described below.  To the extent that you believe the government has already produced this material, please identify where precisely responsive information exists within the existing productions.[1]  In addition, as set forth below, Mr. Archer requests that the government provide certain particulars, which are necessary for Mr. Archer to prepare for trial and prevent undue surprise.

**Background**

   To date, the government has produced millions of documents from many different custodians.  Among the production are all manner of documents, produced in a variety of forms, many of which have made it particularly burdensome to review.  For example, as we have previously raised, the government produced an 850 GB drive containing a variety of forensic images of devices without any indication of what material might constitute Rule 16 discovery.  The government has also produced material that lacks metadata and in some cases that appears to have had certain metadata stripped from it, or that is otherwise impossible to search using automated means.  For example, one "document" (FULTON 0001) is actually a 4,565 page scanned pdf of records from Fulton Meyer, consisting of a mix of e-mails, financials statements,

---

[1]  Of course in requesting specific discovery, Mr. Archer does not in any way relieve the government of its obligation to provide appropriate disclosures pursuant to Rule 16 of the Federal Rules of Criminal Procedure, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), the Jencks Act, 18 U.S.C. § 3500, and any other rule requiring the disclosure of evidence or information to criminal defendants.



and other records.  Depending on the quality of images and scans, text recognition works with varying success and reliability.  Separately, the government failed to provide any useful description of its production of over three million documents it received from the Securities and Exchange Commission.  The government stated simply that the documents were produced to the SEC "by multiple custodians," but virtually all of the documents lacked custodian metadata.

With respect to electronic data the government obtained from e-mail service providers pursuant to warrant, the government initially produced data regardless of whether the material fell within the warrant's scope.  As you are aware, the Court ordered the government "to replace the production with a new production consisting solely of materials responsive to the warrant, and to do so on a rolling basis."  The government began its rolling productions on August 29, 2017, when it produced approximately 1,000 documents, and as of the date of this letter, the government's production is still not complete.  In addition, the government has identified a sub-set of materials it received in response to the warrant that it maintains may be subject to the "crime fraud" exception, but has expressly decided not to seek a ruling on that issue yet.  As a result, Mr. Archer is in a position where he does not know what evidence the government believes falls within the scope of Rule 16.

The productions to date are unwieldy and make it difficult to prepare for trial.  The government provided no information regarding which documents relate to the charges against Mr. Archer.  And not only is the volume of information enormous and undifferentiated, certain of the production load files and metadata were corrupted.  We worked in tandem with a vendor – at significant expense to Mr. Archer – in an attempt to isolate files of interest and then manually identify associated native image files.  Certain load files were corrupted in the entirety and had to be replaced.

### Prior (And Renewed) Discovery Requests

We have previously discussed the government's disclosure obligations with respect to a few discrete topics.

By letter dated June 17, 2016, I raised Mr. Archer's request for all discovery in the *Gerova* matter.  (A copy of my letter is attached as Exhibit 1).  Then, in the period from August 2016 to October 2016, we e-mailed concerning this request.  I explained that Jason Galanis's admitted history of fraudulent activity is relevant to our defense theory that Mr. Galanis deceived and used Mr. Archer.  I also explained that the government's year-long wiretap of Mr. Galanis's phone was discoverable because it may give rise to motions and was exculpatory to Mr. Archer. In addition, the wiretaps are Rule 16 material to the extent that Mr. Archer (or any of the other defendants) is recorded.  The government was unable to confirm, however, that Mr. Archer is not captured on the wiretap, and it otherwise flatly rejected my requests for discovery.  (A copy of our correspondence is attached as Exhibit 2).  Since that time, Mr. Galanis has pleaded guilty in this case, admitting to yet another fraud.  His history of fraudulent conduct is a core defense, and I renew my request that the government produce the *Gerova* evidence, including all discovery materials, 3500 material, and trial exhibits.

From January to April 2017, we discussed the government's review of materials



responsive to a December 2016 search warrant issued under the Stored Communications Act.  As you know, we requested that the government document its search protocol and keep detailed records of its privilege determinations.  (A copy of my April 6, 2017 letter is attached as Exhibit 3).  Other than confirming that the government intended to disregard our suggested search terms to isolate potentially privileged communications,[2] I do not know how the government conducted its review or whether it kept any records, but I request that the government produce any records that it created in connection with the review of the materials received in response to the warrant.  That material is plainly discoverable under Rule 16, as it will serve as the basis for motion practice.

I also have pointed out to the government (and the Court) that certain critical metadata was missing from the documents received pursuant to the search warrant.  Dating back to at least October 6, 2017, I noted that the metadata associated with e-mails produced by the government lacked the metadata that some of the very same documents contained when Mr. Archer produced them to the government.  In particular, the documents produced by the government had been stripped of metadata fields including DATE_SENT, TIME_SENT, TIME_ZONE, MIME_TYPE, AUTHOR, DATE_ACCESSED, TIME_ACCESSED, PRINTED_DATE, FILE_SIZE, PGCOUNT, PATH, INTFILEPATH, INTMSGID, and MD5HASH.  Mr. Archer received a metadata overlay from the government on November 27, 2017, which contained some but not all of this missing metadata—as I promptly informed the government, DATE_ACCESSED, TIME_ACCESSED, INTFILEPATH, and INTMSGID were still missing.  We were also unable to load metadata for 10 documents where the metadata overlay was corrupted.  A copy of our recent correspondence on this issue is attached as Exhibit 4.  The government then provided an additional metadata overlay by email on December 11, 2017, that resolved some of these issues but still did not provide the critical DATE_ACCESSED and TIME_ACCESSED fields.

In the period from June 2017 to July 2017, I additionally requested any and all court orders, subpoenas, warrants, or other process issued in connection with the government's investigation in this case. The government flatly refused.  (A copy of our correspondence is attached as Exhibit 5).  Since that time, it has come to my attention that the government continues to issue grand jury subpoenas in connection with this case, notwithstanding that the use of post-indictment grand jury process in order to prepare for trial is plainly prohibited.  I therefore renew my request for all orders, subpoenas, warrants, or other process issued in connection with the government's investigation, which is plainly discoverable under Rule 16.

## <u>Requests for Discovery and Particulars</u>

---

[2]      As you know, the government informed me that it would be disregarding our proposed search terms and would use only the names of attorneys.  I do not know which attorney names were ultimately used, and I do not know how the government attempted to screen communications involving those attorneys.  For example, to ensure that e-mails from me were reviewed for privilege, I do not know what search terms the government may have used (*e.g.*, "Matthew Schwartz", "Matthew L. Schwartz," "Matt Schwartz", "Matthew", "Matt," "mlschwartz@bsfllp.com", "mschwartz@bsfllp.com", etc.).



Page 4

Our review and trial preparations require additional guidance from the government, which has not yet provided the level of detail needed for Mr. Archer to understand the specific criminal acts he is accused of.  Mr. Archer needs particulars and greater specificity with respect to evidence concerning the charges against him as well as potentially exculpatory and impeaching evidence.  At present and without appropriate disclosures, Mr. Archer will be at a serious and constitutionally unfair disadvantage at trial.

On behalf of Mr. Archer, we request that the government produce the materials and information described below.  **To the extent that this information may be in the custody of the SEC (including the court-appointed receiver in _SEC v. Atlantic Asset Management_), or any cooperating witness, the government must search their files as well.**  The government has repeatedly stated that its investigation of this matter was done hand-in-glove with the SEC, and indeed stated at the initial conference that the vast bulk of discovery would be material gathered by the SEC.  The government therefore has an obligation, under well-established case law and practice in this District, to search the SEC's files for responsive materials, including any _Brady_ or _Giglio_ material.  I appreciate that the government has recently informed me that it will review for _Brady_ "any interview notes or testimony taken in connection with the investigation into Atlantic Asset Management/Wakpamni Bonds that is in the possession of the SEC."  It seems from my recent conversations with the SEC and your office, however, that the SEC is likely in possession or control over a substantial volume of other material—documents, e-mails, and the like—that the government has never reviewed.  (A copy of my December 20, 2017 letter to the Court discussing this material is attached for your reference as Exhibit 6).  We would ask that you do so promptly.

The particulars and disclosures requested below are not intended to define the outer boundary of the government's obligations under Rule 16, _Brady_, _Giglio_, the Jencks Act, or any other source of law.

### Demand For Particulars

Please identify:

1. With respect to each of the conspiracies charged in the Indictment,[3] the names of all unindicted co-conspirators and the time period during which each of them is alleged to have taken part in the conspiracy, including when and how each of them learned of and joined the conspiracy;

2. The names of other unidentified individuals, entities, and accounts in the Indictment, including all persons or entities allegedly defrauded or otherwise harmed;

3. Any acts, overt or otherwise, that Mr. Archer is alleged to have taken in furtherance

---

[3]     In this letter, the term "Indictment" refers to the original indictment in this case, the superseding indictment, the original complaint, and any other superseding indictments, complaints, criminal informations, or charging documents arising from the same set of facts.



of the conspiracy charged in Count One of the Indictment;

4. All purchases or sales of securities that the government contends comprise the securities fraud charged in Count Two, including for each the (i) identity of the relevant security, (ii) the date of the transaction, (iii) whether the transaction was a purchase or a sale; and (iv) the price and counterparty for the transaction.

5. With respect to the securities fraud charged in Count Two, whether the government contends that Mr. Archer is liable for a primary violation, or as an aider and abettor, or both.  If the answer is both, please clarify whether the government contends that Mr. Archer acted as both a primary violator and an aider and abettor for each of the transactions identified in response to section 4, and if not, identify for each one the government's theory of liability as to Mr. Archer.

6. Any instance of Mr. Archer's allegedly criminal conduct, including all false or misleading statements or representations allegedly made by Mr. Archer;

7. Particulars as to precisely how any funds were misappropriated for Mr. Archer's benefit; and

8. Particulars as to how Mr. Archer was "well aware" "of Jason Galanis's efforts to locate and gain control of the Investment Advisers" and "that client funds were to be used for the purchase of the bond issuances."

## <u>Discovery Demands</u>

**A.    Statements of Defendants**

1. The substance of any relevant oral statement made by Mr. Archer, before or after indictment, in response to interrogation by a person Mr. Archer knew was a government agent, if the government intends to use the statement at trial. Fed. R. Crim. P. 16(a)(l)(A).

2. Any relevant written or recorded statement by Mr. Archer within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence could be known, to the government. Fed. R. Crim. P. 16(a)(l)(B)(i).  This request includes, without limitation:

   a. All written or recorded statements of witnesses that reflect, relate, or incorporate any relevant statements purportedly made by Mr. Archer;

   b. Notes or memoranda of any government agent or attorney containing the substance of any statement purportedly made by Mr. Archer; and

   c. All other documents that reflect, relate, or incorporate any relevant statements purportedly made by Mr. Archer.



3. The portion of any written record containing the substance of any relevant oral statement made by Mr. Archer, before or after indictment, in response to interrogation by a person the defendant knew was a government agent.  Fed. R. Crim. P. 16(a)(l)(B)(ii).  This request includes without limitation all documents, including notes, prepared by any government employee or agent that contain the substance of any relevant statement purportedly made by Mr. Archer.

4. All written or recorded statements of any alleged coconspirators, including Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, and Bevan Cooney made to any person(s) at any time and place, as well as the substance of any oral statements purportedly made by them, if not embodied in a writing.  If any such statements are recorded, a transcript and audible copy of each recording is requested.

**B.  Prior Acts and Criminal Records**

5. The prior arrest and conviction records of all named defendants (including defendants who have pleaded guilty), including a complete criminal history for each and the docket number and jurisdiction of all prior and pending cases.

6. Specific information concerning any evidence that the government may seek to introduce at trial pursuant to Rules 609 or 404(b) of the Federal Rules of Evidence and the theory of its admissibility, including the description of any "prior similar act" by all named defendants or any other alleged uncharged misconduct evidence covered by Rules 609 or 404(b).

7. All information that the government intends to use as part of any sentencing calculations or proceedings, including information regarding (a) "relevant conduct" and (b) adjustments and departures.

8. All documents (including communications and recordings) tending to show that John Galanis or Jason Galanis ever defrauded or misled other individuals, including investors and/or business partners.  This request includes, but is not limited to, all documents supporting the government's allegations in the following cases: *United States v. Galanis*, Case No. 87-cr-00520 (SDNY); *United States v. Galanis*, Case No. 15-cr-00643 (SDNY); *SEC v. Penthouse International, Inc., et al.*, Case No. 05-cv-00780 (SDNY); and *SEC v. Galanis, et al.*, Case No. 15-cv-07547 (SDNY).

9. All documents (including communications and recordings) tending to show that John Galanis or Jason Galanis ever defrauded or misled other individuals in Case No. CR-01-03177-TJW, filed in the Southern District of California.

10. All documents and communications supporting fraud allegations obtained during investigations of John Galanis and Jason Galanis, whether or not those investigations led to the filing of charges against either person.



### C.  Investigative Reports and Materials

11. All rough notes of any government agent (including employees of the Department of Justice or the Securities and Exchange Commission) containing the substance of any statements purportedly made by Mr. Archer, Jason Galanis, John Galanis, Gary Hirst, Hugh Dunkerley, Michelle Morton, and Bevan Cooney.

12. The names of all law enforcement and other governmental personnel involved in the underlying investigation, and all written reports, including rough notes, prepared by them or based on information provided by them.

13. All documents responsive to our requests that are in the possession of the "prosecution team," including any agency that participated in a joint investigation with the USAO in this case or any prior case involving John Galanis or Jason Galanis, including but not limited to the SEC, U.S. Postal Inspection Service, and the Federal Bureau of Investigation.

14. All records, documents or other materials regarding any electronic surveillance, in this matter, including any information obtained pursuant to a court order from any:  (a) telephone line, (b) facsimile line, (c) beeper, transponder, buzzer, or motion indicator, (d) pen register, (e) e-mail, or (f) any other means of communication such as text message, BBM, WhatsApp, and the like, which pertains to the investigation of this case or the conduct alleged in the indictment. If court authorization was obtained, please provide a copy of any court requests and well as any documents submitted in support of any such court requests.

15. Any and all court orders, subpoenas of any kind, warrants (including arrest warrants), or other process issued in connection with the government's investigation in this case, along with any applications for the same (whether or not approved).  Please confirm whether any subpoenas or other process remain outstanding, and identify any party that the government contends is under a continuing obligation to produce documents under a subpoena or any other obligatory government document request or court order.

16. Please identify all searches of persons, place, or data sources that occurred during any phase of the investigation.  Please provide the date and location of the search, all persons present, and a list of the items seized.

17. Records of all scientific analyses or tests conducted in the case.  This request includes, but is not limited to, forensic, fingerprint, chemical, digital, and handwriting analyses, as well as all underlying data pertaining to all analyses or tests.

18. All subpoenas, letter requests (including voluntary requests for production of documents), formal and informal document requests involving foreign countries, and correspondence with actual or potential government witnesses or their counsel, and



transmittal letters reflecting what documents were sought, what documents were obtained by the government during the course of the investigation or since the return of the indictment. This information is critical to make sure that all documents within the possession, custody, or control of the government are produced, and to ensure that there is no ambiguity as to what has (or has not) been obtained by the government and produced to the defense, and to enable the defendant to serve meaningful Rule 17(c) subpoenas for additional material.

**D.    *Brady*, *Giglio*, and *Jencks* Material**

19. All exculpatory information pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). This includes all information that is known by the government (or which may become known to the government through the exercise of due diligence) and that is favorable to the defense and is material to the issue of guilt and/or punishment. It also includes all information indicating, in whole or in part, that Mr. Archer did not commit the offenses with which he has been charged, regardless of whether the information is admissible at trial. As you are aware, the government's *Brady* obligations require it to conduct a thorough review of all information in its possession and to identify for the defense all *Brady* material found during that review. The government has produced millions of pages of documents over the past year and has yet to identify what material within its productions were *Brady* material. Please confirm that you will identify all *Brady* material expeditiously.

20. All documents or information (in whatever form) indicating or tending to establish that any of the allegations in the Indictment are not true.

21. All documents or information (in whatever form) indicating or tending to establish that Mr. Archer or any alleged co-conspirator engaged in any conduct or any of the transactions which form the basis of the Indictment in reliance upon advice provided by counsel, accountants, or other professionals.

22. All documents or information (in whatever form) indicating or tending to establish that Mr. Archer or any alleged co-conspirator engaged in any conduct or entered into any of the transactions which form the basis of the Indictment with the good faith belief that his or her conduct did not constitute a crime.

23. All documents or information (in whatever form) indicating or tending to establish that Mr. Archer did not personally gain from the alleged crimes.

**E.    Witness Information**

24. The names and addresses of any government witness who made any arguably favorable statement concerning Mr. Archer, or who was unsure of Mr. Archer's participation in the offenses charged, and all documents that refer to or reflect such information. *Chavis v. North Carolina*, 637 F.2d 213, 223 (4th Cir. 1980); *Jones v. Jago*, 575 F.2d 1164, 1168 (6th Cir. 1978); *Jackson v. Wainwright*, 390 F.2d 288, 298 (5th Cir. 1968).



25. The name, last known address, and telephone number, of each prospective government witness. *Gregory v. United States*, 369 F.2d 185, 188 (D.C. Cir. 1966)).

26. The name and last known address of every witness to the offenses charged who was interviewed by the government, but will not be called as a government witness.

27. The name and last known address of any unindicted co-conspirators. *United States v. Amawi*, 531 F. Supp. 2d 823, 825-26 (N.D. Ohio 2008); *United States v. DeGroote*, 122 F.R.D. 131, 137-38 (W.D.N.Y. 1988); *see also United States v. Anderson*, 31 F. Supp. 2d 933, 938 (D. Kan. 1998) ("The defendants are entitled to know the identity of any unindicted co-conspirators.").

28. All prior written or recorded reports of any oral statements of each prospective government witness relating to this case, and all rough notes taken by any government agent (including yourself or any other representative of the DOJ) of communications with prospective government witnesses.  This includes oral or written statements of witnesses relayed by their authorized representatives by way of proffer or otherwise.

29. The prior arrest and conviction records of all potential government witnesses, including a complete criminal history for each, and the docket number and jurisdiction of all prior and pending cases.

30. All evidence that any prospective government witness has ever made any false statement to a federal or state governmental agency whether or not under oath or under penalty of perjury, and/or does not have a good reputation in the community for honesty.  *See* Fed. R. Evid. 608(a).

31. Any evidence that any prospective government witness is biased or prejudiced against any defendant, or has a motive to falsify or distort his or her testimony. *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987).

32. All evidence that the testimony of any prospective government witness is inconsistent with or contradicted by that of any other person or prospective witness. *Kyles v. Whitley*, 514 U.S. 419, 469-70 (1995).

33. All evidence of discussions about, or advice concerning, any contemplated prosecution of or enforcement action against any prospective government witness, and any possible plea bargain, request for immunity, non-prosecution agreement, deferred prosecution agreement, civil settlement, or any other potential disposition, even if no disposition was reached or the advice not followed.  *Brown v. Dugger*, 831 F.2d 1547, 1555 (11th Cir. 1987) (Clark, J. concurring) (evidence that witness sought plea bargain is to be disclosed, even if no deal struck); *Haber v. Wainwright*, 756 F.2d 1520, 1524 (11th Cir. 1985).  This request includes all evidence of any oral or written communication with any witness, including attorney proffers made on behalf of any witness, involving any government agent, including employees of the DOJ (including staff and non-legal



personnel) and SEC.

34. All monetary payments and/or other benefits that have been provided or offered to any witness or potential witness by any governmental agency, including but not limited to any and all: (a) express or implied promises or other inducements made by any governmental agent or agency regarding non-prosecution of any witness or potential witness for any offense, including any release after arrest without prosecution; (b) assistance provided to any witness or potential witness regarding disposition and/or sentencing in any pending or past criminal case against any witness or potential witness; and (c) implicit or explicit promises made, or to be made, by any governmental agent or agency regarding an adjustment in the witness's or potential witness's immigration status in this country, including, but not limited to work permits and the like, and any promises that the witness's or potential witness's cooperation will be made known to immigration authorities (to aid the witness or potential witness in avoiding deportation, or for any other purpose).  If promises or offers were made orally, please reflect in writing the content of those promises.  Include any statements by any witness that suggest the witness's belief that such a promise or offer was made, even if one was not made in the government's view.

35. All aliases or fictitious names used by the witness or potential witness within the last ten years, the facts surrounding the use of each name, and copies of every document or identification card in which a false identity was used.  Each false name should be identified by (1) the real name of the individual using the alias; and (2) the date, time, and place of its use.

36. Other information that adversely reflects on the credibility of any witness or potential witness, or that bears on the motive of the witness or potential witness to implicate any individual.  This request includes not only information presently within your own knowledge, but also information within the knowledge of all agents and any witness or potential witness involved in any way in this matter, and you are specifically requested to obtain all responsive information from such persons.

37. The identity of any (a) actual or potential government witness, or (b) other person, including without limitation, any alleged co-conspirator, who was given a polygraph examination during the investigation of this case or the conduct giving rise to the charges in this case, and complete information regarding each polygraph examination, including the date, time, and place of the examination, the identity of all persons present, the questions asked, and the results of such examination.  *See Jacobs v. Singletary*, 952 F.2d 1282, 1287-89 (11th Cir. 1992) (due process violated by failure to disclose polygraph examination information).

38. Any and all documents and/or personnel files of all law enforcement witnesses that cast doubt upon their credibility or are otherwise favorable to the defense, including documents regarding a lack of veracity, violations of rules and regulations or other misconduct, and any discipline contemplated or meted out.



39. The full transcripts of the Grand Jury or other testimony of any potential government witnesses.  *Brady v. Maryland*, 373 U.S. 83 (1963); 18 U.S.C. § 3500; *see also Dennis v. United States*, 384 U.S. 855, 873-875 (1966) (disclosure of grand jury materials should be ordered upon a showing of particularized need).  We also request that the government move to unseal the grand jury transcripts pursuant to Federal Rule of Criminal Procedure 6(e).

**F.      Documents or materials obtained from third parties (whether by subpoena or other means)**

40. All documents, including electronic data, produced to the government by any third party, including but not limited to, the following:

   a. Wakpamni Lake Community Corporation
   b. Hughes Capital Management and any of its parent corporations, affiliates, and subsidiaries
   c. Atlantic Asset Management and any of its parent corporations, affiliates, and subsidiaries
   d. BFG Socially Responsible Investing Limited
   e. Bonwick Capital
   f. Burnham Securities Inc. and any of its parent corporations, affiliates, and subsidiaries, including but not limited to, Burnham Financial Group, Burnham Municipal Capital LP, and Burnham Indian Tribal Sovereignty Program
   g. Calvert Capital Partners G.P.
   h. COR Fund Advisors
   i. Depository Trust Company
   j. GMT Duncan LLC
   k. Private Equity Management
   l. Rosemary & Rue LLC
   m. Rosemont Seneca Bohai LLC
   n. Sovereign Nations Development Corp.
   o. The Wolff Law Firm
   p. Thorsdale Fiduciary & Guaranty Company Ltd.
   q. Valor Group Ltd. and any of its parent corporations, affiliates, and subsidiaries, including but not limited to, Wealth Assurance Holdings, Ltd.
   r. Wealth Assurance Private Client Corporation

41. Please separately identify all documents received by any government agent from an outside lawyer, *i.e.*, a lawyer not working for the government, or any other person. Please also identify the government agent(s) who procured these documents, and each government agent who has had access to such documents.  Please also provide all evidence of any statements any lawyer has made to any government agent with respect to these documents.



### G. Privilege Assertions and Waivers

42. The identity of any person or entity that has asserted any privilege or doctrine as the basis for withholding or not producing any documents, and any documents relating to the assertion of any such privilege including any and all privilege logs.

43. Any documents reflecting a waiver of privilege or doctrine, the identity of the person or entity waiving the privilege or doctrine, and/or the scope of any such waiver.

### H. Expert reports

44. A summary of any testimony the government intends to use during its case-in-chief at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence, describing the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.  Fed. R. Crim. P. 16(a)(1)(G).  The defense cannot begin to evaluate the nature and extent of potential defense expert testimony until the government makes the disclosures required by Rule 16(a)(1)(G).

### I. Documents and Tangible Objects

45. Copies of all documents or other exhibits which may be introduced at trial by the government.

46. A list of the evidence the government intends to offer in its case-in-chief.

47. The sources of all documents provided by the government, identified by Bates range.

48. Notice of any charts, summaries or calculations the government will seek to offer into evidence, pursuant to Rule 1006 of the Federal Rules of Evidence, copies of such charts, summaries, or calculations, and all information on which such charts, summaries, or calculations are based.

49. All documents the government intends to provide to any witness to refresh the memory of that witness for the purpose of testifying at trial, under Rule 612 of the Federal Rules of Evidence.

50. All documents tending to show or suggest that John Galanis and Jason Galanis had substantial wealth, including documents tending to show ownership of or access to luxury items such as real property, automobiles, jewelry, boats, and airplanes, and all representations by John Galanis, Jason Galanis, or any other person concerning such items, including testimony given in *United States v. James Tagliaferri*, Case No. 13-cr-115 (RA) (SDNY).



**J.     Conflicts Issues**

51. Please identify all victims of the offenses alleged in the Indictment.  For any organizational victim, please identify any parent companies, subsidiaries, and any publicly held corporation that owns 10% or more of the organizational victim's stock; if there are no such parents, subsidiaries, or stockholders, please so state.

**K.     Suppression Issues**

52. As a predicate to motions pursuant to Rule 12, Mr. Archer requests that the government identify each exhibit that it intends to introduce during the trial and that the government inform him of the following:

    a.   Whether the government intends to offer into evidence any electronic documents obtained via the December 28, 2016 search warrants;

    b.   Whether the government intends to offer into evidence any documents produced by or otherwise obtained from Mr. Archer;

    c.   Whether the government intends to offer into evidence Mr. Archer's bank or other financial records, telephone records, or telephone conversations;

    d.   Whether the government intends to offer into evidence any documents produced by or obtained from the Clifford Wolff Law Firm, from CKR Law (or any predecessor or successor firm), or from Olshan Frome Wolosky LLP;

    e.   Whether the government intends to offer into evidence any statement made by the defendants, any current or former counsel of the defendant (or any agent of counsel), or any current or former family member of the defendant, and the substance of any such statement;

    f.   Whether any evidence or information in the government's possession, custody or control was obtained from any current or former counsel of the defendant, or any agent of counsel, and the substance of such evidence or information;

    g.   Whether any evidence or information in the government's possession, custody or control was obtained from any firm (or any agent thereof) that provided professional services to Mr. Archer, and the substance of such evidence or information;

    h.   Whether any evidence or information in the government's possession, custody or control was obtained from any current or former family members and the substance of such evidence or information;

    i.   Whether any evidence or information in the government's possession, custody, or control was obtained by a search and seizure conducted by the government, and a description of such evidence or information;



j.  Whether any evidence or information in the government's possession, custody, of control was obtained through electronic or mechanical surveillance; including without limitation wiretaps, video recording, body wires, pen registers, and/or surveillance of telephone calls, and a description of such evidence or information;

k.  Whether any evidence or information in the government's possession, custody, or control was obtained through the use of a GPS or other tracking device, or other tracking technology, and a description of such evidence or information;

l.  Whether any evidence or information in the government's possession, custody, or control was obtained through a mail cover and/or trash cover and a description of such evidence or information; and

m.  Whether the government used any informant or undercover agent during its investigation of the charges of the indictment or any related allegations.

Because some or all of the requests in this letter may be the subject of motion practice, I request that the government respond to this request no later than Monday, January 8, 2018.  If you would like to meet and confer regarding any of the issues identified in this letter, I am of course available to do so.

On behalf of Mr. Archer, we reserve the right to supplement these requests as we continue our preparation for trial.  Thank you in advance for your prompt response to this request, and for your continuing cooperation in providing discovery.

Sincerely,

  /s/  Matthew L. Schwartz
Matthew L. Schwartz

# Exhibit 1

# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7th FLOOR • NEW YORK, NY 10022 • PH. 212-446-2300 • FAX 212-446-2350

MATTHEW L. SCHWARTZ
Tel.:  (212) 303-3646
E-mail:  mlschwartz@bsfllp.com

June 17, 2016

**BY HAND DELIVERY**

Brian R. Blais
Aimee Hector
Rebecca Mermelstein
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Re:    *United States v. Jason Galanis, et al.*, No. 16 Cr. 371 (RA)

Dear Brian, Aimee, and Rebecca:

As you know, we represent Devon Archer in the above-referenced matter.  As you requested at the initial pretrial conference in this case, please find enclosed one 2TB hard drive and one 1TB hard drive to be loaded with the discovery in the above-referenced matter, including the contents of the servers and other electronic media taken from Atlantic and Hughes.

In addition, to the extent that you were not already planning to produce it, we respectfully request that the Government produce to Mr. Archer all discovery in *United States v. Jason Galanis, et al.*, No. 15 Cr. 643 (PKC), including any discovery that may have been produced, or may be produced, as *Brady*, *Giglio*, or 3500 material, as well as all trial exhibits, 404(b) material, or material otherwise subject to the Government's motions *in limine* in that case.  Please let me know if that will require us to provide you with an additional hard drive or drives.

Sincerely,

Matthew L. Schwartz

Enc.

# Exhibit 2

| | |
|---|---|
| **From:** | Mermelstein, Rebecca (USANYS) <Rebecca.Mermelstein@usdoj.gov> |
| **Sent:** | Friday, October 14, 2016 4:52 PM |
| **To:** | Matthew L. Schwartz; Blais, Brian (USANYS) |
| **Cc:** | Hector, Aimee (USANYS) |
| **Subject:** | RE: US v. Devon Archer 16 Cr. 371 (RA): Discovery Production |

We have not identified any recordings with Mr. Archer. If you would like to provide us with any telephone numbers used by Mr. Archer during the time frame of the recordings we are happy to run those numbers to confirm that fact.

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Friday, October 14, 2016 4:37 PM
**To:** Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>; Blais, Brian (USANYS) <BBlais@usa.doj.gov>
**Cc:** Hector, Aimee (USANYS) <AHector@usa.doj.gov>
**Subject:** RE: US v. Devon Archer 16 Cr. 371 (RA): Discovery Production

Thank you for your response.  In stating your view that the recordings are not discoverable, are you representing that Mr. Archer is not captured on any recording?

Matthew L. Schwartz
BOIES, SCHILLER & FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Friday, October 14, 2016 4:33 PM
**To:** Matthew L. Schwartz; Blais, Brian (USANYS)
**Cc:** Hector, Aimee (USANYS)
**Subject:** RE: US v. Devon Archer 16 Cr. 371 (RA): Discovery Production

Matt,

We are aware of our discovery obligations and will continue to comply with them.  We do not believe, however, that (i) Jason Galanis's "history of fraudulent activity;" nor (ii) evidence obtained through the consensual monitoring of Jason Galanis's phone, falls within the purview of Rule 16 or of Brady.  Accordingly, we do not intend to produce such materials.

Best,

Rebecca

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Friday, October 14, 2016 11:44 AM
**To:** Blais, Brian (USANYS) <BBlais@usa.doj.gov>; Mermelstein, Rebecca (USANYS)
<RMermelstein@usa.doj.gov>
**Cc:** Hector, Aimee (USANYS) <AHector@usa.doj.gov>; Sheinwald, Ellie (USANYS) [Contractor]
<ESheinwald@usa.doj.gov>
**Subject:** RE: US v. Devon Archer 16 Cr. 371 (RA): Discovery Production

Brian, Rebecca, Aimee –

Following up on the below now that your trial has concluded and you've had some breathing room.

Also, we intend to make another travel request on Mr. Archer's behalf.  Shall I continue to report that
the government objects?  Please let me know, and have a great weekend.

-mls

**From:** Matthew L. Schwartz
**Sent:** Tuesday, September 13, 2016 12:16 PM
**To:** Blais, Brian (USANYS); Mermelstein, Rebecca (USANYS)
**Cc:** Hector, Aimee (USANYS); Sheinwald, Ellie (USANYS) [Contractor]
**Subject:** RE: US v. Devon Archer 16 Cr. 371 (RA): Discovery Production

Brian –

As you know, one of the defense theories that we are exploring is that Jason Galanis deceived and/or
used Mr. Archer.  His history – now admitted – of fraudulent activity is certainly relevant to that theory,
and constitutes Brady material and material subject to disclosure under Rule 16(a)(1)(E).

In addition, I note that some of the correspondence in connection with the start of the Gerova trial
references the fact that Jason Galanis's phone was monitored and recorded by the government for over
a year.  Please produce all such recordings, text messages, or communications of any sort.  Any
recording (written or oral) of Mr. Archer is of course discoverable under Rule 16(a)(1)(B); any recordings
that the government contends are co-conspirator statements are discoverable under Rule 16(a)(1)(E);
and the full set of recordings is discoverable under that same rule and pursuant to the Brady doctrine.

We are actively reviewing the discovery you have provided so far, and we will certainly have additional
requests, but there is no reason for the government to withhold the information described above, which
is readily producible and plainly discoverable.

Matthew L. Schwartz
BOIES, SCHILLER & FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

2

**From:** Blais, Brian (USANYS) [mailto:Brian.Blais@usdoj.gov]
**Sent:** Tuesday, August 23, 2016 1:19 PM
**To:** Matthew L. Schwartz; Mermelstein, Rebecca (USANYS)
**Cc:** Hector, Aimee (USANYS); Sheinwald, Ellie (USANYS) [Contractor]
**Subject:** RE: US v. Devon Archer 16 Cr. 371 (RA): Discovery Production

Matt, we are aware of the existence of your request for the Gerova discovery. What we haven't heard is a theory for why that material is discoverable in the Wakpamni matter. We will of course produce any part of that discovery that we intend to use at the Wakpamni trial or that otherwise fits within Rule 16, that is Brady or Giglio material, or that is a prior statement of a witness we intend to call at the Wakpamni trial. But that universe falls far short of encompassing the entirety of the Gerova discovery.

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Tuesday, August 23, 2016 11:52 AM
**To:** Mermelstein, Rebecca (USANYS)
**Cc:** Blais, Brian (USANYS); Hector, Aimee (USANYS); Sheinwald, Ellie (USANYS) [Contractor]
**Subject:** RE: US v. Devon Archer 16 Cr. 371 (RA): Discovery Production

Thank you. You should still have a 4 TB drive, which we sent down in the space when you asked for another big drive (8/10) and when you clarified that everything would fit on the existing 2 TB drive (8/11). Assuming you aren't expecting any more massive productions, could you please send the 4 TB drive back to us, as those things aren't cheap.

Alternatively, our request for the discovery in the case before Judge Castel remains outstanding, and you can load that on the drive and send it back. I think you had mentioned that you didn't see that request. It came in the same letter in which we sent you the 1 TB drive back in mid-June, which you obviously received since you've sent the drive back to us. Anyway, I am attaching it again for your convenience. Thanks.

-mls

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Monday, August 22, 2016 6:29 PM
**To:** Matthew L. Schwartz
**Cc:** Blais, Brian (USANYS); Hector, Aimee (USANYS); Sheinwald, Ellie (USANYS) [Contractor]
**Subject:** US v. Devon Archer 16 Cr. 371 (RA): Discovery Production

Matt,

Attached please find a cover letter for a discovery production that was mailed to you today.

Best,

Rebecca

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# Exhibit 3



MATTHEW L. SCHWARTZ
Tel.:  (212) 303-3646
E-mail:  mlschwartz@bsfllp.com

April 6, 2017

**BY ELECTRONIC MAIL**

Brian Roger Blais
Aimee Hector
Rebecca Gabrielle Mermelstein
United States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

    **Re:**    *United States v. Galanis, et al.*, No. S1 16 Cr. 371 (RA)

Dear Brian, Aimee, and Rebecca:

    We represent Devon Archer.  We write in regards to the search warrants directed to Google and Apptix that call for e-mails and other data in accounts associated with our client and that of Sebastian Momtazi.

**BACKGROUND**

    As we have previously represented, rough searches of the emails in the relevant accounts indicate that they contain at least approximately 9,000 documents from within the warrants' date range that may implicate the attorney-client privilege.  Mr. Archer's original motion before the District Court and his subsequent Second Circuit appeal, mandamus petition, and motion for a stay pending appeal were all animated by his profound concerns regarding the government's invasion of these privileged communications, which concerns have been laid out in detail.

    At this point, an incredibly large volume of privileged (not to mention irrelevant) information has been produced to the government pursuant to the warrants,[1] and we accordingly wish to put in place procedures designed to safeguard the privilege and ensure that privileged information does not taint the continued litigation of this case.  Of course in proposing such procedures, Mr. Archer does not in any way waive his right to challenge the appropriateness of

---

[1]    As you know, we had a telephone call on the morning of April 3, 2017 to discuss the warrants.  During that call, you stated that both Google and Apptix had now produced account information to the government in response to the warrants, and that the government would produce everything it received from those third parties to Mr. Archer in the next few days.  As of the date of this letter, we have still not yet received that production.



the warrants or to seek to suppress the use of any evidence derived, directly or indirectly, from them, including on the grounds that privileged materials have tainted the prosecution.

Indeed, the government has recognized that it will bear the consequences of failing to appropriately ensure that Mr. Archer's privilege is not breached. The government stated in its written response to Mr. Archer's motion in the District Court that it intended to "use a wall AUSA or taint team to review the defendant's emails for privilege," and invited Mr. Archer's counsel to provide a list of attorney names to use in identifying privileged documents. The government reiterated and expanded upon this commitment at the January 31, 2017 conference before Judge Abrams:

> To the extent that there are privileged communications, we take [Archer's counsel] obviously at his word that there are, and we are happy to run whatever lawyers' names defense proffers through and segregate those things. Ultimately, the risk is on the government. If it turns out that that gives rise to a suppression motion because [Archer's counsel] doesn't like the way it's been done, then he can bring that motion, . . . and if that risk is on the government, then that risk is on the government.

Jan. 31, 2017 Hr'g Tr. at 16:15-24; *see also id.* at 18:21-22 ("THE COURT: . . . As Ms. Mermelstein noted, the risk is on the government.").

The Court also asked at the January 31 conference whether the government would "be willing to meet with defense counsel, as was suggested, and try to agree upon a protocol for reviewing the documents." *Id.* at 16:25-17:2. Counsel for the government responded that the government was, "of course, happy to discuss a protocol with defense counsel," including "what search terms we want and whether or not there are additional search terms that need to be added, etc." *Id.* at 17:3-8. The government relied on these same representations in successfully moving to dismiss Mr. Archer's Second Circuit appeal:

> [T]he Government has already stated that it is prepared to work with counsel for Archer and Cooney regarding the parameters of the review. During the status conference before Judge Abrams during which Archer's motion was discussed, the Government stated on the record, "To the extent that there are privileged communications, we take [Archer's counsel] obviously at his word that there are, and we are happy to run whatever lawyers' names defense proffers through and segregate those things." (Tr. 16). Because the review protocol has not yet been implemented and because the Government has indicated its willingness to consider the views of counsel for Archer . . . before finalizing the review protocol, Archer cannot demonstrate that his purported harm is "actual or imminent."

Feb. 10, 2017 Affirmation of Brian R. Blais ¶ 41.



## THE GOVERNMENT'S PROPOSED REVIEW PROTOCOL

First and foremost, Mr. Archer agrees that it is imperative that the government adopt and finalize, and then strictly adhere to, a "review protocol" to ensure protection of the privilege.

When we spoke on April 3rd, you informed me that the government's current intention was to take the following steps to review the Google and Apptix material for privilege:

1. Run a list of search terms provided by counsel for Mr. Archer and Mr. Momtazi to segregate potentially privileged documents. You informed us that if the government for any reason rejects a proposed search term, you will inform us of that fact so that we may discuss the issue further.

2. Have a "wall" AUSA review the potentially-privileged materials.

3. If the "wall" AUSA determines that material is not privileged, it will be released to the prosecution team. If the "wall" AUSA determines that material is privileged, it will be withheld from the prosecution team. If the "wall" AUSA has questions, he or she will "seek guidance."

### A.      The Government's Proposed Review Protocol Is Deeply Problematic

As you are aware a number of courts have criticized the practice of using a "wall" AUSA to conduct a privilege review generally. *See, e.g., see In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006); *United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *12 (S.D.N.Y. Dec. 5, 2003); *United States v. Hunter*, 13 F. Supp. 2d 574, 583 & n.2 (D. Vt. 1998); *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994). In this case, however, the specific review protocol suggested by the government raises additional concerns.

*First,* the identity of the "wall" AUSA is important. When we spoke, you were not yet able to tell me who the "wall" AUSA will be, or whether that person will be a member of the Securities and Commodities Fraud Task Force (*i.e.*, the unit within the Office that is handling the prosecution of this case), or whether the wall AUSA will be supervised by the same people that supervise the prosecution team. In order to maintain a true "wall," it is obviously critical that anyone exposed to privileged material be entirely isolated from the prosecution team, meaning that they do not come from the same office or report to the same supervisors.

*Second*, your response that, in the event of a question, the wall AUSA will "seek guidance" is a potentially problematic one. To the extent that the wall AUSA merely seeks a second opinion or a sounding board, it is imperative that the person they speak to be pre-designated so that the same standards that apply to the wall AUSA can apply to the person from whom they seek guidance. More problematic, though, was your suggestion when we spoke that the wall AUSA may "seek guidance" from the prosecution team itself. There is no circumstance in which this should happen: simply put, there is no "wall" between the AUSA with access to



privileged materials and the prosecution team if the two are allowed to speak freely.  Making decisions about whether a document is privileged has nothing whatsoever to do with the work of the prosecution team, or the facts of the case – it turns only on whether an attorney and client are communicating in confidence, for the purposes of giving or receiving legal advice.  *See generally In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321, 324 (S.D.N.Y. 2003) (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1036 (2d Cir. 1984)).[2]

*Third*, and most troublingly, you suggested that the wall AUSA may be tasked with deciding whether the so-called "crime-fraud exception" applies to otherwise privileged documents.  It would be profoundly inappropriate for the government to unilaterally determine that a document fell within the crime-fraud doctrine, however, or for that determination to be made as part of the privilege review itself.  For example, in *United States v. Levin*, Judge Forrest was deeply critical of the government's practice of a wall AUSA bringing a motion for a ruling that the crime-fraud exception applied to certain otherwise-privileged documents recovered as the result of a search warrant.  She reasoned that:

> The Court believes that the practice of having the Wall AUSA file a motion for application of the crime-fraud exception on behalf of the prosecution team conflicts with the Wall AUSA's intended role to prevent overbreadth of the Government's seizure of material pursuant to a search warrant. In the Wall AUSA's circumscribed role, he or she is not supposed to affirmatively act on behalf of the prosecution. Several courts in this district have expressed concern over the very practice of utilizing a Wall AUSA to conduct an initial review of seized material for potential privilege issues in the first instance. By bringing the instant motion, the Wall AUSA has gone one step further. What the Court finds particularly problematic in this instance is that the Wall AUSA, at least implicitly, bases her motion on her substantive awareness of the content of the documents at issue. This raises the potential Fourth Amendment concerns the ethical wall was intended to avoid

Id. at *2 (internal citations and footnotes omitted).

What the government proposes to do here – having the wall AUSA unilaterally and without process determine whether the crime-fraud exception applies – goes at least one step further still, and effectively converts the wall AUSA into a member of the prosecution team. This stands the purpose of "taint teams" on their head, and would allow the government to

---

[2]     Of course, whether a communication is privileged is sometimes a fact-bound question, but it is not a question that *anyone* in the government has the facts to adequately answer, because those facts are necessarily part and parcel of the privilege.  It is for that reason that we propose below an alternative review protocol in which Mr. Archer – the holder of the privilege – makes the initial privilege determination.



substantively benefit from the wall AUSA's having had access to the contents of privileged communications. *See id.* ("As the wall is for the protection of the *defendant's* rights, it is decidedly not to give the Government a substantive look into that which it has no right to see."); *see also id.* at *2 n.5 ("when a Wall AUSA uses the very information seen to make a motion in the Court in which the criminal matter is being prosecuted, that Wall AUSA has stepped into substantive participation in the case.").

In short, the review protocol envisioned by the government, in addition to unnecessarily endangering the attorney-client privilege, is deeply flawed.

**B.      The Government Must Carefully Document, in Writing, its Review Protocol**

Especially in light of the numerous problems with the government's proposed review protocol, on behalf of Mr. Archer, I reiterate my request that the government document its review protocol ***in writing*** so that there is no ambiguity about how the government has decided to undertake and actually conducted the review.

At a minimum the government should document, ***in writing***, the following:

a.   The terms and methodology used to isolate potentially privileged documents from presumptively non-privileged ones.

b.   The review protocol as adopted, and the complete set of instructions and information given to the wall AUSA to follow in conducting his or her review, including the procedures for how and from whom to "seek guidance."

c.   The contents and other particulars of any communications between the wall AUSA and anyone else on the subject of the review, including supervisors.  In the event that the government chooses to permit the wall AUSA to speak to the prosecution team or its supervisors – something that we reiterate should never happen – those communications *themselves* should all be in writing so that they are clear and unambiguous.

d.   The manner in which the wall AUSA conducts her or her review, including his or her decision about which documents are privileged or non-privileged, and why.

**MR. ARCHER'S PROPOSED REVIEW PROTOCOL**

The far better – and far safer – way to proceed would be to allow Mr. Archer to conduct the privilege review himself, just as he would with respect to a subpoena.  We therefore propose a slightly modified version of the protocol adopted by the Sixth Circuit when faced with similar circumstances in *In re Grand Jury Subpoenas*, 454 F.3d 511.  *See also Levin*, 2015 WL 5838579 (after execution of search warrant, arguably privileged documents were segregated and provided to defense counsel to review and assert claims of privilege).  Specifically, we propose that:

1.   Mr. Archer's counsel run the attached search terms (which were compiled jointly by Mr. Archer and Mr. Momtazi's lawyers) against the information produced by Google



and Apptix, to identify potentially-privileged documents. The documents would then be split into two batches: those that hit on the search terms, and those that did not.[3]

2. Any document that does *not* hit on one of the search terms will be immediately produced to the government to review, subject to the terms of the warrants.[4] Of course, a list of search terms cannot substitute for a true privilege review, and Mr. Archer would reserve the right to "claw back" any privileged document that evaded the review terms. Likewise, the government would still have to be alert to the possibility that a privileged document might have been inadvertently produced.

3. Mr. Archer's counsel would conduct a privilege review of those documents that do hit on one or more of the search terms:

   a. Any documents that we determine to be non-privileged will be produced to the government to review, subject to the terms of the warrants.

   b. Any documents that we determine to be partially privileged will be appropriately redacted, and the redacted version produced to the government to review, subject to the terms of the warrants.

   c. Any document that we determine to be privilege will be withheld and put on a privilege log. This log will "contain summary information, as well as some intelligible explanation of [Mr. Archer's] privilege claims, for each document" that it lists. *In re Grand Jury Subpoenas*, 454 F.3d at 524.

4. In the event that the government believes that a document has been wrongly withheld as privileged, the parties can meet and confer and/or the government can challenge the designation in court.

In Mr. Archer's view, the approach outlined above would obviate the concerns that the government has repeatedly raised regarding any potential delay in its review of the fruits of the warrants. *See*, *e.g.*, *id.* at 523-24 (stating that, where one is "only to conduct a privilege review

---

[3]     Mr. Archer would also be willing to discuss having the Court employ a Special Master to run the search terms and separate the two batches of documents, if the government believes that is necessary. *See In re Grand Jury Subpoenas*, 454 F.3d at 524 (ordering use of Special Master who would "conduct a word search of the documents, searching for those words contained in the list," and who would "then separate documents containing any of those words from the rest.").

[4]     Obviously, many, many documents – both privileged and non-privileged – will not be responsive to the warrants because they will have nothing to do with the subject matter of this case. Mr. Archer believes that potentially relevant documents should be isolated before any privilege analysis is performed in order to avoid unnecessary time and expense analyzing irrelevant documents for privilege. This can be accomplished by generating a list of responsiveness search terms and using them to make a first cut. Indeed, Mr. Archer has already agreed upon such a list with the SEC.



of the subset of documents that contain names of attorneys or law firms that they will place on a list that will then be provided to the government, assuming this 'first cut' proceeds apace, the government should obtain the bulk of the responsive documents rather quickly," and that the employment of a Special Master to segregate potentially privileged documents would "ensure that the first cut does, in fact, proceed in a timely fashion").

*     *     *

We look forward to discussing the above with you, and to working together to craft a review protocol that effectively protects the attorney-client privilege.

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz

cc:    Silvia Serpe, Esq.
       *Counsel to Sebastian Momtazi*



**Search Terms to be Segregated for Privilege Review**

| | | |
|---|---|---|
| ac | eno | kim* w/5 miller |
| acp | esq* | *klasko* |
| advice | exhibit* | *klaskolaw* |
| advise | external w/5 attorney* | *klaskolaw.com |
| affidavit* | external w/5 counsel* | kmiller* |
| ainsztein | external w/5 lawyer* | konigsberg |
| aneuman* | eweiss* | langston |
| "anticipation of litigation" | firm* | law* |
| arnold w/5 porter | gc | lawyer* |
| apks | gottlieb | legal* |
| *apks.com | *gunder* | legal* w/5 analy* |
| ariel w/5 neuman | *gunder.com | legal* w/5 advice |
| attorney* | gunderson | legal* w/5 advise |
| attorney* w/5 client | hbiden* | legal* w/5 review* |
| attorney* w/5 priv* | heather w/5 king | litigat* |
| atty | hodgson w/5 russ | mark w/5 hunter |
| att'y | *hodgsonruss* | megan w/5 burke |
| biden | *hodgsonruss.com | Mcsweeney |
| "bird marella" | *htflawyers* | Mdhunter* |
| *birdmarella* | *htflawyers.com | mhunter* |
| *birdmarella.com | *htwlaw* | naveen |
| boies | *htwlaw.com | neuman |
| boise | hunter | nicelli |
| brian w/5 patterson | hunter@rstp.com | outside w/5 attorney* |
| *bsfllp* | *huntertaubmanlaw* | outside w/5 counsel* |
| *bsfllp.com | *huntertaubmanlaw.com | outside w/5 lawyer* |
| *ckr* | in house" w/5 attorney* | pai |
| *ckrlaw* | in house" w/5 counsel* | plaintiff* |
| *ckrlaw.com | in house" w/5 lawyer* | pozharskyi |
| claim* | inside w/5 attorney* | priv* |
| confid* | inside w/5 counsel* | protect* |
| compliance | inside be/5 lawyer* | schwartz |
| counsel* | internal w/5 attorney* | schwerin |
| counterclaim* | internal w/5 counsel* | seltzer |
| culhane | internal w/5 lawyer* | sweiss* |
| cwolff* | jason w/5 ford | *theseltzerfirm* |
| declaration* | *johnnicelli* | *theseltzerfirm.com |
| defendant* | *johnnicelli.com | *serperyan* |
| direction w/5 attorney* | joseph w/5 park | *serperyan.com |
| direction w/5 counsel* | justice | sheckart |
| direction w/5 lawyer* | kalsko | sec |
| "document retention notice" | "kaye scholer" | securit* w/5 commission |
| doj | *kayescholer* | securit* w/5 exchange |
| dunn | *kayescholer.com | subp* |
| edell | kelly w/5 vazquez | testi* |



| | | |
|---|---|---|
| "united states" w/5 | vallacher | workproduct* |
| attorney* | wechter | work-product* |
| "united states" w/5 office | weiss | wp |
| usao | wolff | wpd |
| us w/5 attorney* | *wolfflawfirm* | zeejah |
| us w/5 office | *wolfflawfirm.com | *zeejahlaw* |
| vadym | *wolff.law | *zeejahlaw.com |
| vadym.pozharskyi* | work w/5 product | |

# Exhibit 4

| | |
|---|---|
| **From:** | Matthew L. Schwartz |
| **Sent:** | Saturday, December 02, 2017 2:48 PM |
| **To:** | Mermelstein, Rebecca (USANYS) |
| **Cc:** | Quigley, Brendan (USANYS); Tekeei, Negar (USANYS) |
| **Subject:** | RE: Govt Production # 16 |

Rebecca –

Putting aside the question of whether the government is responsible for reviewing information in the SEC's possession, I am asking a logistical question that the SEC directed me to address to you:  Is the material that they listed below material that you have already produced to us in criminal discovery?  If the answer is yes, I don't want to receive it again and have to incur significant expense mounting, reviewing, and de-duping it; if the answer is no, I will make sure I get it from the SEC.

The SEC doesn't want to tell me what they've given the USAO, and you don't want to make representations about the SEC, but the result shouldn't be that Mr. Archer has to pay an extraordinary amount of money to re-review material that may have already been produced when the SEC and USAO have unquestionably investigated jointly and are sharing information and evidence with one another.  Indeed, you will recall that one reason that we had a disagreement about the scope of the confidentiality order in this case (before Judge Abrams' ruling on our motion regarding the SW) was that you said you could not be restricted from sharing information with the SEC.

Can't you and Nancy talk to one another and one of you give me the factual answer to the question of whether the stuff she listed is the same as stuff you've already produced, or whether it's different?  This would be a silly thing to have to go to Judge Abrams and/or Judge Pauley with.

Also, please let me know if (a) you've found out anything about the missing metadata, and (b) you have a simply tracking spreadsheet of your prior productions so we can compare to what we've received.  Thanks.

-mls

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Wednesday, November 29, 2017 3:37 PM
**To:** Matthew L. Schwartz

**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** RE: Govt Production # 16

No problem.

With respect to your other question, we have produced the Rule 16 material in our possession to date, including any materials received from the SEC, and will continue to produce any additional materials we receive in a timely fashion.  We are not in a position to make representations concerning materials being made available to you by the SEC in civil discovery.

Best,

Rebecca

---

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Wednesday, November 29, 2017 2:44 PM
**To:** Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>
**Cc:** Quigley, Brendan (USANYS) <BQuigley@usa.doj.gov>; Tekeei, Negar (USANYS) <NTekeei@usa.doj.gov>
**Subject:** RE: Govt Production # 16

Thank you.  And when you get a chance, please also let me know about those items the SEC referred us to you on, so that we can get back to them.

-mls

---

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Wednesday, November 29, 2017 2:01 PM
**To:** Matthew L. Schwartz
**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** RE: Govt Production # 16

I'll look into it and get back to you shortly.

---

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Wednesday, November 29, 2017 1:33 PM
**To:** Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>
**Cc:** Quigley, Brendan (USANYS) <BQuigley@usa.doj.gov>; Tekeei, Negar (USANYS) <NTekeei@usa.doj.gov>
**Subject:** RE: Govt Production # 16

We have now heard back from our vendor.  The file you provided solved some, but not all, of the problems.

Most importantly, while a number of fields were filled in by the file you provided, several were not including

- Date Accessed – Date
- Date Accessed – Time
- Email – Internet Message ID
- Int File Path

The first two of these in particular are potentially highly important, and we know this metadata to be included in the files because, again, it was in the exact same documents when we produced them to the government.

Also, the metadata was corrupted with respect to certain documents.  Specifically, I understand that there were 10 corrupted line items in the overlay provided to us that had incomplete bates numbers and corrupt delimiters:

| Error lines in original overlay file | Production::Begin Bates |
|---|---|
| 331 | SearchWarrant_v2_00018930 |
| 2442 | SearchWarrant_v2_00020976 |
| 2443 | SearchWarrant_v2_00020977 |
| 2444 | SearchWarrant_v2_00020978 |
| 3904 | SearchWarrant_v2_00021778 |
| 5145 | SearchWarrant_v2_00023131 |
| 8032 | SearchWarrant_v2_00025007 |
| 8033 | SearchWarrant_v2_00025008 |
| 8086 | SearchWarrant_v2_00025009 |
| 8087 | SearchWarrant_v2_00025010 |

Could you please provide the missing data?  Thanks.

-mls


Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

---

**From:** Matthew L. Schwartz
**Sent:** Tuesday, November 28, 2017 11:50 AM
**To:** 'Mermelstein, Rebecca (USANYS)'
**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** RE: Govt Production # 16

Thanks, this was received.  We are sending it to the vendor now and will let you know if there are any remaining questions.

Regarding past productions, we have a tracking sheet but it contains all sorts of work product.  If you have a simple list that you wouldn't mind sharing it would save my client the expense of us reformatting our spreadsheet.  If you don't have such a list, we'll send you what we have -- although I assume you would need to have a good tracking system to be able to confirm that we have it all.

-mls

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Monday, November 27, 2017 3:42 PM
**To:** Matthew L. Schwartz
**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** [Not Virus Scanned] [Not Virus Scanned] FW: Govt Production # 16

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.
Matt,

Per your request, I am resending the October 20th metadata overlay.  Please confirm it has come through.  If you want to send us a list of what you have received to date in discovery we're happy to double check to make sure you have received everything that has gone out.

Best,

Rebecca

Dear Counsel,

Attached to this e-mail, you will find Production 16 and a corresponding cover letter pertaining to US v. Jason Galanis et al.

Please let me know if you have any issues accessing the data.

Best,

Christine Lee
Paralegal Specialist
U.S. Attorney's Office SDNY
One Saint Andrews Plaza,
New York, NY 10007

Tel: 212-637-2272
Email: Christine.Lee@usdoj.gov

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# Exhibit 5

| | |
|---|---|
| **From:** | Mermelstein, Rebecca (USANYS) <Rebecca.Mermelstein@usdoj.gov> |
| **Sent:** | Wednesday, July 26, 2017 12:05 PM |
| **To:** | Matthew L. Schwartz |
| **Cc:** | Blais, Brian (USANYS); Griswold, Andrea (USANYS) |
| **Subject:** | RE: US v. Jason Galanis et al, discovery update |

1. It goes without saying that I vehemently disagree with your characterization that the Government has disregarded the warrant. We will get you a proposed protective order shortly. We believe our method of producing the email SW results was proper and appropriate - if you want a remedy beyond the protective order, please raise it with the Court.

2. I'm not prepared to answer this question. If you have basis for a belief that you are entitled to this information, please let me know.

3. I do not believe you are entitled to this information and we do not intend to provide it.

Best,

Rebecca

-----Original Message-----
From: Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
Sent: Wednesday, July 26, 2017 11:57 AM
To: Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>
Cc: Blais, Brian (USANYS) <BBlais@usa.doj.gov>; Griswold, Andrea (USANYS) <AGriswold@usa.doj.gov>
Subject: RE: US v. Jason Galanis et al, discovery update

Rebecca --

1. I do not understand how you can claim that you "explicitly" informed me that you intended to disregard the warrant and instead produce the entirety of the account records, save what is being screened for privilege. Your July 12 e-mail says that you were beginning to load the "SW results" for discovery. And your June 19 e-mail simply says that the government would be producing documents in two batches, one prior to the privilege review and the remainder after. While your June 19 e-mail does use the word "all," any reasonable person would read that to mean all records responsive to the warrant, since the government has absolutely no authority to seize anything else. Certainly nothing was "explicit" about your plans. While I appreciate your offer to enter into a protective order (please propose one acceptable to the government so that we don't lose time), that is hardly a complete remedy for the dissemination of my client's and other people's confidential information.

2. Thank you for the clarification regarding the documents produced by Mr. Dunkerly. Can you confirm that the documents were produced by him recently; e.g., the government has not been holding them since prior to the charges in this case?

1

3.  I disagree with you completely about subpoenas or other compulsory process.  Whether or not my client might have standing under the Fourth Amendment, there are other grounds on which he might have a motion based upon the government's use of process.  Please produce any and all court orders, subpoenas, warrants, or other process issued in this case.  I cannot understand any legitimate reason why the government would be hesitant to produce this material, other than that it might give rise to a motion.

Thanks.

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

-----Original Message-----
From: Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
Sent: Wednesday, July 26, 2017 9:14 AM
To: Matthew L. Schwartz
Cc: Blais, Brian (USANYS); Griswold, Andrea (USANYS)
Subject: RE: US v. Jason Galanis et al, discovery update

Matt,

1.  I'm surprised that you are now objecting to our approach to producing the SW results, as we explicitly made you aware of our intention to proceed in this manner prior to doing so and you did not raise any objection.  I've attached our previous email on the subject.  I don't think that a request from the Government to claw back any non-responsive emails is appropriate, but we would of course consent to the entry of a protective order.  Please let me know if you would like to do that.

2.  I don't agree with you that your client would have standing to challenge the Government's use of compulsory process served on a third party, but rather than fight about it I can tell you that the documents were voluntarily produced.

Best,

Rebecca

-----Original Message-----
From: Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
Sent: Tuesday, July 25, 2017 7:45 PM
To: Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>
Cc: Blais, Brian (USANYS) <BBlais@usa.doj.gov>; Griswold, Andrea (USANYS) <AGriswold@usa.doj.gov>
Subject: RE: US v. Jason Galanis et al, discovery update

1.  Yes, that answers my question.  My concern is that it appears to me that the government has not done any review of the e-mails to determine what is within the scope of the warrant, and instead simply produced the accounts in their entirety (less whatever has been segregated for privilege review).  I do not understand how that is appropriate, but more importantly, it exposes Mr. Archer's confidential business and personal communications, as well as privileged communications, to all of the defendants in this case without restriction.  I would ask the government to require the other defendants to return all copies of the documents from the accounts associated with Mr. Archer, to be replaced with only documents that are actually responsive to the warrant.  If you have already conducted a review for responsiveness and believe that what you produced is within the scope of the warrant, please let me know that, as well.

2.  I don't understand your position.  If there is some sort of process pursuant to which the government has obtained these documents, my client is entitled to know under Rule 16 because it could be the basis for a motion.  In particular, the timing of the production obviously raises the possibility either that the government has obtained some sort of court order to get this material, or that the government is continuing to issue subpoenas for the production of documents.  Either way I believe we are entitled to know.

Please let me know your position on these issues.  Thanks.

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

-----Original Message-----
From: Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
Sent: Tuesday, July 25, 2017 7:34 PM
To: Matthew L. Schwartz
Cc: Blais, Brian (USANYS); Griswold, Andrea (USANYS)
Subject: Re: US v. Jason Galanis et al, discovery update

1.  I'm not sure I understand the first question, but the most recent production went to all defendants in identical fashion. It consists of all non-priv emails from all five accounts. Does that answer the question?

2.  With respect to number 2, I'm not prepared to answer.

Sent from my iPhone

On Jul 25, 2017, at 5:52 PM, Matthew L. Schwartz
<mlschwartz@BSFLLP.com<mailto:mlschwartz@BSFLLP.com>> wrote:

3

Rebecca -

We have now received the hard drive.  Two quick questions as we're getting into it:


1.      To confirm, you produced the same results from the SW to all defendants, correct?  In other words, your most recent production of emails to Mr. Archer is not different than to the other defendants notwithstanding the fact that two of the accounts were associated with him, right?  (I understand that you previously produced to us only the entirety of the account information produced by the service providers).

2.      What is the material produced by Hugh Dunkerley responsive to?  Was there a subpoena or other form of process, or was it voluntary?  And when was the production made - was it recent, or have you had these documents for some time?

Please let me know, or let me know if you'd like to discuss.  Thanks.

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)



From: Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
Sent: Wednesday, July 12, 2017 4:33 PM
To: dtouger@aol.com<mailto:dtouger@aol.com>;
mtremonte@shertremonte.com<mailto:mtremonte@shertremonte.com>; Matthew L. Schwartz;
paulanotari@aol.com<mailto:paulanotari@aol.com>;
nbiale@shertremonte.com<mailto:nbiale@shertremonte.com>;
hassen@oandh.net<mailto:hassen@oandh.net>;
eugene.ingoglia@allenovery.com<mailto:eugene.ingoglia@allenovery.com>;
gmorvillo@morvillolaw.com<mailto:gmorvillo@morvillolaw.com>
Cc: Blais, Brian (USANYS); Griswold, Andrea (USANYS); Sheinwald, Ellie (USANYS) [Contractor]
Subject: RE: US v. Jason Galanis et al, discovery update

Counsel,

I wanted to provide an update regarding the below.  We received the Morton/Lisa/Clement emails yesterday and received the SW results from our vendor today.  We are thus now beginning the process of loading the materials to hard drives for those that have provided them.

The hard drives should go out sometime next week depending on copying times.

Best,

Rebecca

From: Mermelstein, Rebecca (USANYS)
Sent: Monday, June 19, 2017 11:48 AM
To: 'dtouger@aol.com<mailto:dtouger@aol.com>' <dtouger@aol.com<mailto:dtouger@aol.com>>;
'mtremonte@shertremonte.com<mailto:mtremonte@shertremonte.com>'
<mtremonte@shertremonte.com<mailto:mtremonte@shertremonte.com>>;
'mlschwartz@bsfllp.com<mailto:mlschwartz@bsfllp.com>'
<mlschwartz@bsfllp.com<mailto:mlschwartz@bsfllp.com>>;
'paulanotari@aol.com<mailto:paulanotari@aol.com>'
<paulanotari@aol.com<mailto:paulanotari@aol.com>>;
'nbiale@shertremonte.com<mailto:nbiale@shertremonte.com>'
<nbiale@shertremonte.com<mailto:nbiale@shertremonte.com>>;
'hassen@oandh.net<mailto:hassen@oandh.net>' <hassen@oandh.net<mailto:hassen@oandh.net>>;
'eugene.ingoglia@allenovery.com<mailto:eugene.ingoglia@allenovery.com>'
<eugene.ingoglia@allenovery.com<mailto:eugene.ingoglia@allenovery.com>>;
'gmorvillo@morvillolaw.com<mailto:gmorvillo@morvillolaw.com>'
<gmorvillo@morvillolaw.com<mailto:gmorvillo@morvillolaw.com>>
Cc: Blais, Brian (USANYS) <BBlais@usa.doj.gov<mailto:BBlais@usa.doj.gov>>; Griswold, Andrea
(USANYS) <AGriswold@usa.doj.gov<mailto:AGriswold@usa.doj.gov>>; Sheinwald, Ellie (USANYS)
[Contractor] <ESheinwald@usa.doj.gov<mailto:ESheinwald@usa.doj.gov>>
Subject: US v. Jason Galanis et al, discovery update

Counsel:

We are writing to inform you of three categories of discovery we are preparing for production:


1)     As you know, we obtained a SW on email accounts belonging to Archer, Cooney and Sebastian
Momtazi.  We have segregated all potentially privileged emails which are being reviewed by a wall team.
In order not to delay production, we propose to produce all of the emails (other than those being
reviewed for privilege) to all defendants now.  We will make a supplemental production of any emails
that are ultimately determined not to be privileged at the completion of the privilege review.

2)     We are in the process of obtaining from the Atlantic/Hughes servers emails from the
Atlantic/Hughes email accounts of Michelle Morton, Carolyn Lisa and Dina Clement, which we will
produce to you.

3)     We have various documents produced to us by Hugh Dunkerley, which we also intend to produce
to you.


We will provide you with the size hard drive necessary to receive this discovery shortly.  If you would like
to receive this additional discovery, please provide the hard drive to our paralegal, Ellie Sheinwald.
Please clearly mark the hard drive with your name and the name of your client.

Best,

Rebecca

_____
The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# Exhibit 6



MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

December 20, 2017

**BY ECF**

Hon. Ronnie Abrams
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

Hon. William H. Pauley, III
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

> **Re:** *United States v. Jason Galanis, et al.*, No. S1 16 Cr. 371 (RA)
> *SEC v. Archer, et al.*, No. 16 Civ. 3505 (WHP)

Dear Judge Abrams and Judge Pauley:

We represent Devon Archer, who is a defendant in the above-referenced cases. We write to seek an order compelling the government (either the SEC or the United States Attorney's Office) to answer a simple question: whether certain voluminous material in the possession of the SEC has been produced in criminal discovery. Thus far, the SEC has referred us to the USAO on this question, and the USAO has referred us to the SEC, but both have steadfastly refused to answer. As we discuss below, Mr. Archer has the ability to discover the answer to this very simple question, but only at significant expense to him personally. Because the government has no legitimate interest in making a defendant needlessly spend time and money answering a question that it can answer instantly, we are compelled to raise the issue with the Court.

### BACKGROUND

In the spring of 2016, the USAO charged criminally, and the SEC sued civilly, the same seven defendants.[1] There is no doubt that the agencies' investigations were conducted in concert. Indeed, the USAO has made clear that the discovery in the criminal case consists overwhelmingly of materials gathered by the SEC in its investigation. At the initial conference in the criminal case, the AUSA stated that "[t]he bulk of the discovery is all going to come in a single database. It's documents principally that were subpoenaed by the SEC from numerous different custodians. That database contains about 85,000 documents, not pages, documents, and

---

[1] In an amended complaint, the SEC sued one additional defendant. According to documents filed by the SEC, that defendant resides overseas, and criminal charges against him, if any, have never been unsealed.



is about 75 gigabytes in size." Hearing Tr. 23:15-19, June 8, 2016, *United States v. Galanis et al.*, No. 16 Cr. 371 (RA) (attached as Exhibit A). That database, which has now been produced to the defendants in the criminal case, contains more than half a million pages of documents produced by more than 50 custodians. Moreover, the USAO stated at the initial conference that it would produce an additional approximately four terabytes of information that the SEC seized from the investment advisors involved in this case. *See id.* at 24:22. The USAO has intermittently produced additional documents gathered by and from the SEC.

     In July 2016, the USAO moved to intervene in and stay the SEC action. Mr. Archer opposed, arguing that the SEC and USAO had chosen to initiate their cases simultaneously, and that he should be permitted to defend himself against the SEC's serious claims. Judge Pauley ultimately granted the USAO's motion, but denied a complete stay, instead permitting certain discovery to go forward (essentially, discovery that did not require the production or creation of Jencks Act material), so long as the defendants were actively participating in discovery as well. That is, so long as the defendants did not assert their Fifth Amendment rights, limited discovery could proceed. As to defendants who did assert their Fifth Amendment rights, Judge Pauley entered an order prohibiting them from receiving any discovery material. As a result of these orders and the other defendants' subsequent choices, Mr. Archer alone is participating in discovery with the SEC, and Mr. Archer alone has access to the materials gathered in civil discovery.[2]

     As part of that discovery, Mr. Archer served document requests upon the SEC. As relevant here, the SEC responded that it was in possession (physically or constructively) of certain voluminous documents, and asked whether Mr. Archer wanted them. The SEC described the materials as follows:

- Approximately 40 boxes of documents stored by AAM Alexandria and Stamford offices
- Servers, back up tapes collected from AAM by Receiver from AAM offices in Alexandria and Stamford
- Assorted materials collected by Receiver from AAM Alexandria and Stamford offices. Includes selected documents obtained by Receiver; additional hard drives from Alexandria and Kansas City (old); back up external harddrive of Stamford server; Daniel Turney's back up external harddrive from Alexandria; keys, id cards and employee phones (excluding Morton's); Hughes 2013 tax return; Service providers contracts; quick books data
- Emails from Intel (ISP for AAM Stamford)
- Quickbooks for AAM
- 55 Desktop harddrives; 7 laptops and 10 other devices

---

[2]    To be clear, Mr. Archer has not and does not waive his Fifth Amendment rights. Indeed, Judge Pauley's orders expressly contemplated that Mr. Archer could choose to invoke at a later point, at which time discovery would be stayed completely.



Ex. B. Because the SEC's description was strikingly similar to the USAO's description of certain criminal discovery,[3] Mr. Archer replied that he wanted to understand whether the documents in the SEC's possession were duplicative of documents received in criminal discovery (in which case he did not need to receive them again), or whether they were unique (in which case he wanted them).

In response to Mr. Archer's question, the SEC directed us to speak to the USAO. *Id.* ("As we've discussed, we will not divulge what we have shared with the USAO.")). We therefore asked the USAO a simple question: "Can you please let [us] know if the [USAO] has reviewed and/or produced any of the [above]?" Ex. C.

The USAO refused to answer:

> [W]e have produced the Rule 16 material in our possession to date, including any materials received from the SEC, and will continue to produce any additional materials we receive in a timely fashion. We are not in a position to make representations concerning

---

[3]     The AUSA stated at the initial conference in the criminal case:

> The final two issues are Atlant[ic] and Hughes were the two investment adviser firms that were taken captive and whose clients' money was used to purchase the bonds in this case.

> The SEC received a number of hard drives, USB drives, and laptops from those entities. They searched them using search terms and documents that they deemed relevant or important have been added into the database I described.

> But to the extent the defendants want copies of the entirety of those computer devices, those can be produced. It's about 2 terabytes of data [a piece]. As I understand it from the IT people, the logical way to do is that is to get a separate 2 terabyte hard drive. They make 4 terabyte ones, but they're much more extensive than two smaller ones. So that is the logical way to do it.

> Then finally, leaving aside those particular computer devices that were received, Atlant[ic] and Hughes maintained servers, the entire contents of the servers are either in one case have been given to the SEC but not yet processed and are being given – we simply have no idea what the volume of that is. I mean it's enormous. It's an entire server. I'm not sure yet what the logical way is to make it available.

Ex. A at 24:12-25:8. Mr. Archer informed the USAO that he wished to obtain copies of this material, and provided all hard drives requested by the USAO.



> materials being made available to you by the SEC in civil discovery.

Ex. D.  In response, we reiterated that we were not asking the USAO to take a position on the legal question of whether it has a responsibility to review material in the SEC's position.  *But see United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D.N.Y. 2012) (holding that USAO had obligation to review material in the SEC's possession under *Brady*:  "In the words of Judge Weinfeld, any argument that the Government's duty does not extend so far merely because another agency, not the USAO, is in actual possession of the documents created or obtained as part of the joint investigation is both 'hypertechnical and unrealistic.'" (quoting *United States v. Shakur*, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982)).

> Putting aside the question of whether the [USAO] is responsible for reviewing information in the SEC's possession, I am asking a logistical question that the SEC directed me to address to you:  Is the material that they listed [above] material that you have already produced to us in criminal discovery?  If the answer is yes, I don't want to receive it again and have to incur significant expense mounting, reviewing, and de-duping it; if the answer is no, I will make sure I get it from the SEC.

Ex. D.

The USAO still refused to answer, claiming that "I do not believe it is appropriate to ask the Government to reveal its litigation strategy by identifying which documents have been requested from the SEC."  *Id.*  At the same time, the USAO disclosed that it was producing certain additional documents that it received from the SEC, which the SEC had obtained in civil discovery – including documents that Mr. Archer himself had produced in response to the SEC's document requests.  The newly-produced documents – which, in total, comprise in excess of 8 GB of new data – do not include, however, the materials discussed above.  *Id.*[4]

---

[4]     This creates the anomalous and seemingly unjust situation in which the SEC can cherry-pick information – which it obtains not through its own investigation, but in civil discovery – that it deems helpful and produce it to the USAO for use in the criminal case.  At the same time, the USAO claims that it is not required to review or produce other information in the SEC's possession, and Mr. Archer is barred from sharing evidence that he collects in civil discovery with his co-defendants.  Except for the *Brady* issue about the USAO's obligation to review material in the SEC's possession – which Mr. Archer intends to raise as part of pre-trial motions in the criminal case – this is an unfairness that affects primarily the other defendants, but it is a profound unfairness nonetheless.



## DISCUSSION

The refusal of both the USAO and SEC to answer Mr. Archer's simple, logistical question is troubling. It is all the more troubling because the volume of data involved is truly enormous. While the SEC informed us that it is unable to identify the total volume of data, it was able to confirm that the "Emails from Intel" *alone* – one of the six categories of documents identified by the SEC – would require Mr. Archer to provide a 1.5 terabyte hard drive. *See* Ex. B. Given the descriptions of the other material, it is fair to say that the government is likely sitting on tens of terabytes of information, most if not all of which has not yet been produced or reviewed for *Brady* purposes. It is principally because of the overwhelming amount of material involved that Mr. Archer raises this issue now, rather than waiting until the motions deadline in the criminal case.

The government's proffered reason for refusing to answer the question is also baffling. The SEC offers no explanation for its refusal other than perhaps some common interest type claim ("we will not divulge what we have shared with the USAO"), and the USAO's only explanation is that it refuses "to reveal its litigation strategy by identifying which documents have been requested from the SEC."

But the answer to Mr. Archer's question does not involve any "litigation strategy." Indeed, the SEC has offered to make the documents available to Mr. Archer. We can therefore obtain those documents from the SEC, and – albeit at significant time and expense – determine whether any or all of them have already been produced by the USAO by comparing the document sets. *See* Ex. D. There is no good reason why Mr. Archer should have to incur this monetary expense, nor why his legal team should have to be distracted from trial preparation.

The USAO has consistently blamed the defendants for dragging this case out, and professes a desire to go to trial as quickly as possible. But its conduct belies its words. Any trial must be a fair trial, which means that the defendants must have access to appropriate discovery materials, the USAO must discharge its *Brady* obligations, and the government collectively should not erect senseless and expensive barriers to the defense. The government should therefore be compelled to answer the simple question: has material responsive to Mr. Archer's document requests already been produced in the criminal case, or is some of the responsive material in the SEC's possession unique. Depending on the answer to that question, of course, additional relief may be appropriate.

Thank you for your consideration of this request.

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz

# Exhibit A

1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                          16 CR. 371 (RA)

 5   JASON GALANIS, et al.,

 6             Defendants.

 7   ------------------------------x

                                         New York, N.Y.
 8                                        June 8, 2016
                                         2:45 p.m.
 9

10
     Before:
11
                         HON. RONNIE ABRAMS,
12
                                         District Judge
13

14                            APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     AMEE HECTOR
17   REBECCA MERMELSTEIN
     BRIAN BLAIS
18        Assistant United States Attorney

19   STEVEN WITZEL
          Attorney for Defendant Jason Galanis
20
     MICHAEL TREMONTE
21        Attorney for Defendant Hirst

22   PELUSO & TOUGER
          Attorneys for Defendant John Galanis
23   BY:  DAVID TOUGER

24

25
```

Case 1:16-cr-00247-KPF Document 306-18 Filed 05/22/2017 Page 54 of 96

1

2                    APPEARANCES (CONT'D)

3    SUSAN BRUNE
          Attorney for Defendant Dunkerley
4
     BOIS, SCHILLER & FLEXNER LLP (NYC)
5         Attorneys for Defendant Archer
     BY:  MATTHEW LANE SCHWARTZ
6

7    NEIL BRUCE CHECKMAN
          Attorney for Defendant Morton
8
     SPERTUS, LANDES & UMHOFER, LLP
9         Attorneys for Defendant Cooney
     BY:  MATTHEW DONALD UMHOFER
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Case called)

 2              THE COURT:  If counsel would state your appearances

 3    for the record.

 4              MS. HECTOR:  Good afternoon, your Honor.  Amy Hector,

 5    Rebecca Mermelstein, and Brian Blais for the government.  With

 6    us at counsel table is Postal Inspector Adam Fascio and an

 7    intern with our office, Natalie Noble.

 8              THE COURT:  On behalf of defendants, if counsel can

 9    state their names and then indicate their clients, and if their

10    clients can either stand up or raise their hands so I know who

11    is who, please.

12              MR. SCHWARTZ:  Good afternoon, your Honor.  Matthew

13    Schwartz for Defendant Devon Archer, who is standing in the

14    first row.

15              THE COURT:  Good afternoon to both of you.

16              MR. CHECKMAN:  Good afternoon, your Honor.  Neil

17    Checkman for Michelle Morton who is sitting there in the pink

18    sweater.

19              THE COURT:  Good afternoon to both of you.

20              MS. BRUNE:  Good afternoon, your Honor.  Susan Brune

21    for bail purposes only for Hugh Dunkerley who will stand.

22              THE COURT:  Good afternoon to you as well.

23              MR. TREMONTE:  Good afternoon, your Honor.  Michael

24    Tremonte for Gary Hirst who is standing in the first row with

25    the red tie.

```
1              THE COURT:  Good afternoon.

2              MR. WITZEL:  Good afternoon, your Honor.  Steven

3    Witzel, CJA attorney.  I just walked in the door.  I understand

4    I'm here for Mr. Galanis, Jason Galanis, for bail purposes

5    only.

6              THE COURT:  Do you need a minute with your client?  I

7    understand you just got here.

8              MR. WITZEL:  I just walked in 30 seconds before you

9    came out.

10             THE COURT:  Why don't we have everyone else state

11   their appearances.  Then if you need a few minutes to talk, we

12   can take a break.

13             MR. WITZEL:  Thank you, your Honor.

14             MR. TOUGER:  Good afternoon, your Honor.  David Touger

15   for John Galanis.

16             THE COURT:  Good afternoon.

17             MR. UMHOFER:  Good afternoon, your Honor.  Matthew

18   Umhofer on behalf of Bevan Cooney, who is present in court

19   today.

20             THE COURT:  Good afternoon.

21             Mr. Witzel, would you like to take a little bit of

22   time?

23             MR. WITZEL:  I would very much, your Honor, if -- I

24   don't want to inconvenience everybody.

25             THE COURT:  Why don't we take a break.  Just let us
```

1   know when you're ready.

2           MR. WITZEL:  Thank you, your Honor.

3           (Recess)

4           MR. WITZEL:  Your Honor, thank you for giving us the

5   time.  I think we'll be able to proceed at this point.

6           THE COURT:  Okay.  So good afternoon, all.  I'm

7   Judge Abrams, and this case has been assigned to me.  We're

8   here to present, as I understand it, two of the defendants,

9   Hugh Dunkerley and Bevan Cooney, and arraign all of the

10  defendants on the indictment.

11          It's numbered 16 CR 371.  It was filed on May 31, and

12  the indictment has four counts:  One is conspiracy to commit

13  securities fraud, securities fraud, conspiracy to commit

14  investment adviser fraud, and investment adviser fraud.

15          So let's begin with the two defendants who have not

16  yet had an initial presentment.  I understand that that is

17  Mr. Dunkerley and Mr. Cooney.  Could you both please rise.

18          What I want to do first is to inform you of certain

19  rights that you have, inform you of the charges against you,

20  and consider whether counsel should be appointed for you and

21  decide under what conditions you should be released.

22          So, first, the date and time of arrest of these two

23  individuals?

24          MS. HECTOR:  Your Honor, both defendants were arrested

25  on May 11, 2016, at approximately 9:00 in the morning.

1          THE COURT:  So both of you have the right to remain

2   silent.  You are not required to make any statements.  Even if

3   you have made statements to the authorities, you need not make

4   any further statements.

5          Anything that you say or do can be used against you.

6   You have the right to be released, either conditionally or

7   unconditionally, pending trial, unless I find that there are no

8   conditions that would reasonably assure your presence in court

9   or the safety of the community.

10          You have the right to be represented by counsel during

11   all proceedings, including this one, and during all questioning

12   by the authorities.

13          I understand that you both have counsel for today.

14          Ms. Brune, are you retained for purposes of bail only?

15          MS. BRUNE:  For bail only, your Honor.

16          THE COURT:  If you wish to have the Court appoint you

17   counsel because you are unable to afford counsel, then I would

18   need a financial affidavit from you and would consider that

19   application.  But I understand that there is no such

20   application for either defendant.

21          MS. BRUNE:  Not at this time, your Honor.

22          THE COURT:  Do you understand those rights?

23   Mr. Cooney?

24          DEFENDANT COONEY:  Yes.

25          THE COURT:  And Mr. Dunkerley?

669XGA13

 1                DEFENDANT DUNKERLEY:  Yes.

 2                THE COURT:  So what I'm going to do now is arraign

 3      each of you on the indictment.  That's the charging instrument

 4      that I mentioned a moment ago.

 5                Mr. Dunkerley, let's start with you.

 6                Have you seen a copy of the indictment in this case?

 7                DEFENDANT DUNKERLEY:  I have.

 8                THE COURT:  Have you discussed it with your attorney?

 9                DEFENDANT DUNKERLEY:  I have.

10                THE COURT:  Would you like me to read it out loud, or

11      do you waive its public reading?

12                DEFENDANT DUNKERLEY:  I waive its public reading.

13                THE COURT:  How do you plead to the charges?

14                DEFENDANT DUNKERLEY:  Not guilty.

15                THE COURT:  You may be seated.

16                Mr. Cooney, have you seen a copy of the indictment?

17                DEFENDANT COONEY:  Yes.

18                THE COURT:  Have you discussed it with your attorney?

19                DEFENDANT COONEY:  Yes.

20                THE COURT:  Would you like me to read it out loud, or

21      do you waive its public reading?

22                DEFENDANT COONEY:  I waive.

23                THE COURT:  How do you plead?

24                DEFENDANT COONEY:  Not guilty.

25                THE COURT:  You may be seated.

Case 1:16-cr-00371-RA Document 365-28 Filed 05/22/17 Page 60 of 96

```
 1              Now, Defendant Jason Galanis, could you please rise.
 2              Mr. Galanis, have you seen a copy of the indictment in
 3    this case?
 4              DEFENDANT JASON GALANIS:  Yes, your Honor.
 5              THE COURT:  Have you discussed it with your attorney?
 6    Do you need more time?
 7              MR. WITZEL:  No.  He's discussed it with his previous
 8    attorney.  He has, and we've discussed it.  He's discussed it
 9    with his previous attorney and would waive the reading.
10              THE COURT:  How do you plead to the charges?
11              DEFENDANT JASON GALANIS:  Not guilty, your Honor.
12              THE COURT:  You may be seated.
13              Defendant Gary Hirst, please rise.
14              Have you seen a copy of the indictment?
15              DEFENDANT HIRST:  Yes, your Honor.
16              THE COURT:  Have you discussed it with your attorney?
17              DEFENDANT HIRST:  Yes, your Honor.
18              THE COURT:  Do you waive its public reading?
19              DEFENDANT HIRST:  I do, your Honor.
20              THE COURT:  How do you plead?
21              DEFENDANT HIRST:  Not guilty, your Honor.
22              THE COURT:  You may be seated.
23              Ms. Morton, would you please stand.
24              Have you seen a copy of the indictment?
25              DEFENDANT MORTON:  I have, your Honor.
```

1          THE COURT:  Have you discussed it with your attorney?

2          DEFENDANT MORTON:  I have, your Honor.

3          THE COURT:  Would you like me to read it out loud, or

4   do you waive its public reading?

5          DEFENDANT MORTON:  I waive it, your Honor.

6          THE COURT:  How do you plead?

7          DEFENDANT MORTON:  Not guilty.

8          THE COURT:  You may be seated.

9          And Defendant John Galanis.  Have you seen a copy of

10  the indictment?

11         DEFENDANT JOHN GALANIS:  I'm sorry, your Honor.  I'm

12  hard of hearing.

13         THE COURT:  Have you seen a copy of the indictment, of

14  the charging instrument in this case?

15         DEFENDANT JOHN GALANIS:  Yes, your Honor.

16         THE COURT:  Have you discussed it with your attorney?

17         DEFENDANT JOHN GALANIS:  I have.

18         THE COURT:  Would you like me to read it out loud here

19  in court, or do you waive its public reading?

20         DEFENDANT JOHN GALANIS:  No.  I waive that,

21  your Honor.

22         THE COURT:  How do you plead?

23         DEFENDANT JOHN GALANIS:  Not guilty, your Honor.

24         THE COURT:  All right.  You may be seated.

25         Finally, Devon Archer.  Please stand.

1          Have you seen a copy of the indictment?

2          DEFENDANT ARCHER:  Yes, I have, your Honor.

3          THE COURT:  Have you discussed it with your attorney?

4          DEFENDANT ARCHER:  Yes, I have.

5          THE COURT:  Would you like me to read it out loud, or

6     do you waive its public reading?

7          DEFENDANT ARCHER:  I waive its public reading.

8          THE COURT:  How do you plead?

9          DEFENDANT ARCHER:  Not guilty.

10         THE COURT:  You may be seated.

11         So I understand that bail has been set except for

12    Mr. Galanis, who is detained.  Bail has been set for all of the

13    defendants in this district except for Mr. Cooney and

14    Mr. Dunkerley.

15         MS. HECTOR:  That's correct, your Honor.

16         THE COURT:  What is the government's position with

17    respect to bail for each of these defendants?

18         MS. HECTOR:  Your Honor, I understand that the

19    government and Mr. Dunkerley's counsel are in agreement that

20    the conditions set at his initial presentment out of the

21    district be continued.  Those conditions were a $1,000,000 bond

22    secured by one financially responsible person and $200,000 in

23    real property.

24         His travel is restricted to California and New York,

25    and home confinement is electronic monitoring.

1              MS. BRUNE:  Your Honor, in addition, we'd ask

2     permission to have Mr. Dunkerley remain in the New York area

3     through June 17 so as to obtain counsel.

4              MS. HECTOR:  We, of course, have no objection to that.

5              THE COURT:  So just read through those conditions once

6     more.  A $1,000,000 bond signed by one financially responsible

7     person.  $200,000 worth of property; is that correct?

8              MS. HECTOR:  Correct, your Honor.

9              THE COURT:  Travel restricted to California.  Which

10    district?

11             MS. HECTOR:  To all districts, your Honor.

12             THE COURT:  To all of the districts in California and

13    the Southern District of New York?

14             MS. HECTOR:  Correct, your Honor.

15             THE COURT:  And that he shall remain here until -- I'm

16    sorry.  June 27?

17             MS. BRUNE:  Through June 17.

18             MS. HECTOR:  I guess I should add that he has already

19    surrendered his passport, but he is not to make any new

20    applications.

21             THE COURT:  Has a bond already been signed?

22             MS. HECTOR:  I believe, your Honor, that it has

23    already been signed.  I think it has to be resigned here.

24    Although to the extent the person who signed it is located in

25    California, they should be able to sign it in California and

1   have it sent to the clerk's office here.

2          THE COURT:  So I am going to order those conditions

3   with respect to Mr. Dunkerley.

4          MS. BRUNE:  Thank you, your Honor.

5          THE COURT:  And with regard to Mr. Cooney?

6          MS. HECTOR:  With regard to Mr. Dunkerley, is there a

7   date by which they should be satisfied?

8          THE COURT:  What do you propose?

9          MS. HECTOR:  I think a week should be sufficient.

10          THE COURT:  Ms. Brune, is that enough time, a week to

11   have the bond signed by one financially responsible person and

12   the $200,000 in property?

13          MS. BRUNE:  I believe that's already been posted in

14   the Central District of California.

15          THE COURT:  Is that right?

16          MS. BRUNE:  Yes.

17          MS. HECTOR:  I think as a technical matter, the

18   Southern District bond will supersede the bond in California,

19   and it has to be sort of redone.

20          THE COURT:  So it needs to be reposted.  Is a week

21   enough time to do that is the question.

22          MS. BRUNE:  Yes.

23          THE COURT:  So those two conditions must be completed

24   within one week.  He should sign the bond though today, but he

25   may be released on those conditions.

1          MS. BRUNE:  One of my co-counsel just suggested

2     something to me that I think makes good sense, which is we may

3     want to extend to the Eastern District of New York so he can

4     fly into La Guardia or JFK without being in violation of the

5     bail restrictions.

6          THE COURT:  That's fine.  Will he be supervised by

7     pretrial services in the Southern District of New York or in

8     California?

9          MS. HECTOR:  He'll be supervised in California.  I

10    think he'll just continue to be supervised by his pretrial

11    services officer there this week while he's here.

12         THE COURT:  Ms. Cunningham, is that correct with

13    respect to his supervision will remain in California?

14         MS. CUNNINGHAM:  Yes.

15         THE COURT:  So those conditions will be set with

16    respect to Mr. Dunkerley.

17         MS. HECTOR:  We're in a little bit of -- with regard

18    to Mr. Cooney, we're in a difficult situation, which is the

19    government's general view was that a bond -- that he could be

20    released on bond.

21         The district in which he was first presented generally

22    either released people on their own recognizance or remands

23    them.  So Mr. Cooney was released on his own recognizance.

24         In thinking about the appropriate amount of the bond,

25    the challenge is that the pretrial services report, which was

1   prepared in the district where he was first presented, not

2   here, provides very little information about his financial

3   situation.

4           Indeed, he declined to answer certain questions about

5   his finances, apparently, on the advice of his lawyer at

6   presentment.

7           He lists a residence in Michigan worth about $500,000;

8   $90,000 in a checking account; and two cars with unknown value,

9   although I'm informed by his counsel here that he has sold one

10  of those cars since this report was prepared.

11          The difficulty is that the government, as a result,

12  doesn't have a clear sense -- and the Court doesn't have a

13  clear sense -- what his financial situation is.  It makes it

14  very hard to understand what amount of a bond would guarantee

15  his appearance in this district.

16          I would just note -- in any event, I think he needs to

17  proffer more about his financial situation in order for any

18  bond to be set.

19          THE COURT:  Counsel?

20          MR. UMHOFER:  Your Honor, I think we have no better of

21  an indication of what it would take to get Mr. Cooney here to

22  appear than the fact that he's here today on his own

23  recognizance bond.

24          He's been on that for a month with exemplary conduct

25  during that time, subject to a set of restrictions that are

 1   more than what's necessary in the case.  The bond format states

 2   that the least restrictive condition is always required under

 3   the circumstances, and we have that right here.

 4          You have a man who has known about this case for

 5   months, knew about his arrest.  He was sitting on his stoop

 6   with his passport in hand when the officers arrived to arrest

 7   him.

 8          He's got two kids and a wife.  He's been here.  He

 9   appeared here today on a minimal bond.  I don't think any

10   financial conditions are necessary.

11          I think the Court has all it needs to simply continue

12   the bond that is set or a minimal signature bond with even less

13   restrictions.  And I would like to be heard on some of those

14   restrictions.

15          The bottom line is, in terms of his financial

16   condition, you've got the fact that he owns a house with

17   $100,000 equity in it, you've got his checking account, and

18   you've got his two cars.

19          That's all the Court needs, in addition to what we

20   have here, which is his actual appearance, which makes it clear

21   that he would appear going forward.  If the Court wants any

22   more information, I will proffer it.

23          THE COURT:  I do think it's appropriate to set a bond

24   at the very least.  I think the question is how much.  I don't

25   know if you want to proffer that the information that his wife

1  gave to pretrial services essentially represents his finances.

2  If you don't want to proffer at all, then I'll take the

3  information I have.

4          MR. UMHOFER:  Your Honor, I think that the savings

5  amounts to probably less.  I think probably it's about $60,000.

6  That's the amount he has in savings.  So it's a little bit less

7  than what Mr. Cooney's wife stated.  That's my proffer to the

8  Court.

9          MS. HECTOR:  Let me then add something about what the

10  government knows about Mr. Cooney's financial situation, which

11  is that in 2014/2015, the defendant obtained a $1.2 million

12  loan from City National Bank.

13          In connection with obtaining that loan, he filled out

14  financial information in which he represented to the bank that

15  he had a net worth of approximately $15,000,000.

16          Now, to be clear, the government thinks that many of

17  those statements were false and, indeed, represent the separate

18  crime of bank fraud.

19          He listed among his assets $5,000,000 of the Wakpamni

20  bonds that are at issue in this case which he purchased using a

21  loan -- he purchased using money that had been given to him

22  through Jason Galanis.

23          He did not disclose to the bank that there was any

24  encumbrance on the money that he used to buy the bonds or that

25  he had purchased them using a loan.

1          He then transferred the bonds out of his possession to

2  another entity.  He then reconfirmed in writing for the bank

3  that he continued to own the bonds, which was false.  So I

4  don't think that that was in fact a $5,000,000 asset of his,

5  but he so represented to the bank.

6          He also made representations that he had a $5,000,000

7  life insurance policy, that he owned $2,000,000 in Code Rebel

8  stock, which is no longer worth anything like that as a result,

9  in part, of the conduct here.

10          Even taking out the $5,000,000 of bonds, the

11  $5,000,000 of life insurance, and the $2,000,000 of stock,

12  there should be $3,000,000 more roughly of assets that are

13  nowhere represented in what he's just said.

14          There's just a total disconnect here certainly between

15  what he represented to the bank and what he's now representing,

16  even assuming, as I think is true, that some of what he said to

17  the bank is false.

18          So I do think the bond is nonetheless appropriate in

19  this case, but I think a significant amount is necessary

20  because the defendant certainly, as recently as 2015, appeared

21  to have more serious assets than he claims now.  I don't think

22  this has been a fully forthcoming proffer about the nature of

23  his assets.

24          THE COURT:  Would you like to respond?

25          MR. UMHOFER:  Well, your Honor, I'm not even sure that

1  was a proffer. So there are a lot of facts that were just put

2  forward that are not actually appropriately before the Court on

3  this. That was years ago. Frankly, my client has been

4  decimated by what happened to him in this case finally.

5      Again, your Honor, to come back to the point of what's

6  required to make sure he shows up, he's shown up today without

7  any financial bond whatsoever, and he's going to continue to

8  show up, and he's going to appear here at trial, and he's going

9  to defend himself.

10      So regardless of what's being said here, he's here

11  now, which shows he's going to appear regardless of what the

12  bond is. So the notion that a substantial bond needs to be set

13  is just inconsistent with the fact that for weeks he's been on

14  bond on his own recognizance and has appeared here today and

15  will continue to do so.

16      THE COURT: What I'm going to do is I'm going to set a

17  $1,000,000 bond to be signed by one financially responsible

18  person.

19      How much time would you need to get someone to sign

20  that?

21      MR. UMHOFER: Two weeks, your Honor.

22      THE COURT: That should be signed within two weeks.

23  He can be released on his signature today. Travel should be

24  restricted to the Southern and Eastern Districts of New York,

25  the District of Michigan, and the District of Nevada. That's

1   what pretrial recommended until his expected relocation date of

2   June 20, 2016.

3           Is that acceptable in terms of the travel?

4           MR. UMHOFER:  Your Honor, I'm not sure why a travel

5   restriction would be necessary here.  I understand that it's

6   not been required with some of the other defendants who are

7   similarly situated.

8           A travel restriction to the 48 states seems reasonable

9   under the circumstances.  Mr. Cooney currently lives in an area

10  that spans -- it's very close to a border.  So he's got

11  permission to go into California from Nevada because he's on

12  the border.

13          He also needs to travel for business to continue to do

14  his work.  So, your Honor, we'd request a travel restriction to

15  the 48 states.

16          THE COURT:  Does the government have a position on

17  that?

18          MS. HECTOR:  Your Honor, there's one defendant in this

19  case whose travel has not been restricted to the district that

20  is foreseeable for the defendant to need, and that was as a

21  result of proffers of the need of that defendant to travel more

22  broadly.

23          Given that the defendant has not answered questions

24  about his income or the nature of his work, it seems to me that

25  there's no reason for him to be able to travel to any of the

 1   states.  California, to the extent it's close to the boarder

 2   with Nevada and as a practical matter, he might, in the

 3   ordinary course of his life, cross into California.  That seems

 4   fine.

 5             THE COURT:  So I can going to restrict travel to the

 6   Southern and Eastern Districts of New York, the District of

 7   Michigan, the District of Nevada, all the districts in

 8   California.  And to the extent that he needs to travel for

 9   business, you can submit a request for permission to travel.

10             Has he surrendered his passport or any other travel

11   documents?

12             MR. UMHOFER:  The morning of his arrest, your Honor.

13             THE COURT:  He's to refrain from applying for any new

14   travel documents, refrain from possession of any firearms,

15   destructive devices, and/or weapons.  Surrender of all firearms

16   to pretrial services, and it will be the standard pretrial

17   supervision.

18             Where will he be supervised?

19             MS. CUNNINGHAM:  In his home district, the District of

20   Nevada, is my understanding.

21             THE COURT:  Until he relocates, which is June 20.

22             MR. UMHOFER:  Right.

23             THE COURT:  So he'll be supervised in the district of

24   his residence at the time he's there.  So we'll make it easy.

25             MS. HECTOR:  Your Honor, he appears to own a firearm

1    in Michigan.  Defense counsel has proffered to me that his lack

2    of a firearm's license is because Michigan does not require a

3    firearms license, but I think there should be a specific date

4    for the surrender of that pretrial to pretrial services.

5              THE COURT:  How much time?

6              MR. UMHOFER:  He cannot have access to the gun until

7    he gets there.  So 30 days, your Honor?

8              THE COURT:  So we'll do 30 days for surrender of the

9    firearm.

10             So those are the conditions with respect to

11   Mr. Cooney.

12             MR. UMHOFER:  Your Honor, I just want to clarify.

13             THE COURT:  Yes.

14             MR. UMHOFER:  There are a couple conditions that I

15   just want to make clear.  The Court did not state them, but

16   there's a reference involving handling of investors.  I don't

17   think that's necessary.  In fact, he does business in that

18   area.  That was set when he appeared in Reno, but I don't think

19   it's necessary going forward.

20             THE COURT:  Is the government seeking any other

21   conditions?

22             MS. HECTOR:  No, your Honor.  Michigan is not actually

23   one district.  It has multiple districts.  We have no objection

24   to his travel being permitted within all of the districts in

25   Michigan.

1    THE COURT:  Thank you for clarifying that.  I should

2    have done that.

3    So, yes.  Your clarification is correct.  The

4    conditions that I set will govern.

5    MR. UMHOFER:  Your Honor, may I check with my client

6    for a moment just to make sure we covered everything?

7    THE COURT:  Yes.

8    MR. UMHOFER:  One other request with respect to

9    travel.  He has family near the boarder between Michigan and

10   Ohio.  He would like permission to be able to travel to see

11   them.

12   THE COURT:  How often does he go to see them?

13   MR. UMHOFER:  Not much now, but when he gets to

14   Michigan, it will be regularly.  Perhaps subject to pretrial

15   services approval on that?

16   THE COURT:  That's fine.

17   MR. UMHOFER:  Thank you, your Honor.  Nothing further,

18   your Honor.  Thank you.

19   THE COURT:  Ohio also has multiple districts.  So

20   we'll just clarify that.

21   MR. UMHOFER:  Yes.

22   THE COURT:  So I think that's settled with respect to

23   bail or detention with respect to all of the defendants.

24   Everyone who has been released should be warned that

25   if you fail to appear in court or you violate any of the

1   conditions of your release, a warrant will be issued for your

2   arrest, and you or anyone who signed the bond will not

3   responsible for paying the full amount of the bond.  In

4   addition, you may be charged with the crime of bail jumping.

5           Why don't we turn to discovery.

6           What's the status of discovery?  What does it include?

7   And how long do you think it will take to produce it?

8           MS. HECTOR:  It's a significant volume of discovery in

9   this case.  We produced today just people's individual rap

10  sheets, marshal intake forms, and credit reports for those

11  defendants for whom the government had received them.

12          We have bank records, a GPS affidavit and order, and

13  the results of the GPS order that we will produce to the

14  defendants next week.

15          The bulk of the discovery is all going to come in a

16  single database.  It's documents principally that were

17  subpoenaed by the SEC from numerous different custodians.

18          That database contains about 85,000 documents, not

19  pages, documents, and is about 75 gigabytes in size.  In

20  addition to that, the government has received a number of

21  individual productions in separate databases that it will also

22  produce.

23          The way it proposes to do that is if the defendants

24  provide the government with a 1 terabyte hard drive, we will be

25  able to produce both the entirety of the SEC databases and the

1  database that the government has in one unit.

2      The SEC, as I understand it, maintains its IT

3  processing all in a central location for the country.  So we

4  anticipate having a copy of that SEC database in our possession

5  in about the next two weeks and then making copies for the

6  defendants as we receive their hard drives.

7      In addition, there's a handful of other evidence.

8  There is, for example, the contents of one of the defendant's

9  phones.  There are recordings that were made by one of the

10  defendants.

11      I don't know the exact number of hours, but it's about

12  2 gigabytes worth of data.  And then the final two issues are

13  Atlanta and Hughes were the two investment adviser firms that

14  were taken captive and whose clients' money was used to

15  purchase the bonds in this case.

16      The SEC received a number of hard drives, USB drives,

17  and laptops from those entities.  They searched them using

18  search terms and documents that they deemed relevant or

19  important have been added into the database I described.

20      But to the extent the defendants want copies of the

21  entirety of those computer devices, those can be produced.

22  It's about 2 terabytes of data.  As I understand it from the IT

23  people, the logical way to do is that is to get a separate 2

24  terabyte hard drive.  They make 4 terabyte ones, but they're

25  much more expensive than two smaller ones.  So that is the

1    logical way to do it.

2         Then finally, leaving aside those particular computer

3    devices that were received, Atlanta and Hughes maintained

4    servers, and entire contents of the servers are either in one

5    case have been given to the SEC but not yet processed and are

6    being given -- we simply have no idea what the volume of that

7    is.  I mean it's enormous.  It's an entire server.  I'm not

8    sure yet what the logical way is to make it available.

9         Obviously, the key documents that have been identified

10   will be produced individually.  If the defendants want access

11   to the servers at large, as we understand how to do that, we

12   will make that available.

13         THE COURT:  All right.

14         MS. HECTOR:  So I think from a timing perspective,

15   assuming that the government takes possession of the SEC

16   database in two weeks and assuming that the defendants have

17   given us hard drives by that date, I think it probably will

18   take us something like another two weeks to process it out.

19         So I think we're talking about the bulk of the

20   discovery hopefully being accomplished in the next four,

21   depending on IT issues, six weeks with the servers and the

22   other stuff being done on a rolling basis as we understand

23   exactly what's necessary.

24         THE COURT:  Yes.

25         MR. TOUGER:  David Touger.  The recordings are 2

1    gigabytes.  Whose recordings were they?

2          MS. HECTOR:  Those were recordings made by Defendant

3    Michelle Morton.

4          MR. TOUGER:  And you want the terabyte hard drive and

5    the 2 gig hard drive?

6          MS. HECTOR:  No.  Unless I've gotten the technology

7    wrong, I think the recordings will fit on to the terabyte hard

8    drive in addition to the SEC database.  So one 1 terabyte hard

9    drive should cover the bulk of the documents, unless you also

10    want copies of the hard drives, etc.  Then we need a separate 2

11    terabyte hard drive.

12          THE COURT:  So, defense counsel, how much time -- when

13    should I set another conference?  I'm not going to set a trial

14    date at this time.  I think there's just too much material for

15    you to review.

16          What I would like to do is set another conference.  At

17    that time I'm going to ask whether you intend to make any

18    motions and set a schedule for motions, as well as a trial

19    date.

20          How much time do you think you need?  60 days?  90

21    days?  What do you think makes sense?  Feel free to talk

22    amongst yourselves.

23          (Pause)

24          MR. TOUGER:  Your Honor, the complicating factor here

25    is some of us have a companion date in front of Judge Castel

1    which has, if you can imagine, probably five times the amount

2    of documents as in this case.  And that trial is scheduled for

3    September, which some of us are obviously reviewing all of

4    those documents.

5              THE COURT:  Right.

6              MR. TOUGER:  Now we're being added 85,000 new

7    documents to review.  So we were wondering if we could have

8    until October to get back to you.  We can set it 90 days out,

9    but it would be unrealistic that some of us who have two

10   trials -- and Mr. Checkman also has another case.  Sometime in

11   October would seem like a more realistic time.

12             MR. TREMONTE:  Another complicating factor that's

13   relevant to the Court's evaluation of this is that a

14   substantial component of the discovery issue in that other

15   case -- there are three defendants here who are scheduled to go

16   to trial in that case in September -- a substantial component

17   of that discovery is made available to the defense only at the

18   U.S. Attorney's Office on appointment.

19             So, in addition to the -- I think it's fairly

20   characterized as an overwhelming volume of documents, much of

21   which is relevant to the case, another very substantial chunk

22   of discovery takes, I would say, three to four times as long to

23   review.

24             So realistically, it's all but impossible that we

25   would be able to focus in any meaningful sense on the discovery

1    in this case between six weeks from now and September.

2              MR. CHECKMAN:  Your Honor, Neil Checkman for Michelle

3    Morton.  I would also like to add to that that I've been

4    appointed on this particular case, and at the time of the

5    appointment, your Honor, I was also appointed on several other

6    cases of the large take-downs in this district, White Plains,

7    and two others, one before Judge Nathan and one before

8    Judge Kaplan.

9              There are hard drives' worth of discovery information.

10   I believe it makes sense to put off the next court date in this

11   case until October so we get the chance to get a handle on all

12   of this and be able to do justice to the other cases.

13             THE COURT:  Does anyone have an objection to my

14   putting the case off until October?  No.

15             So why don't we do that.  How long is the trial?  What

16   is the actual September trial date before Judge Castel?

17             MS. HECTOR:  September 12, your Honor.

18             THE COURT:  How long is it expected to last?

19             MS. HECTOR:  It's a little unclear because the

20   defendants are all still in the case, and we'll see what

21   unfolds over the summer, but I think it's going to be many

22   weeks.  I think we will certainly be on trial in the beginning

23   of October.  I'm optimistic that we will be done by the end of

24   October.

25             THE COURT:  So does it make sense to put it off --

1          MR. TOUGER:  The first week of November.  And then I

2    know Mr. Galanis is incarcerated, but he's incarcerated on the

3    other case.

4          THE COURT:  Mr. Witzel, do you want to weigh in on the

5    timing?

6          MR. WITZEL:  When we discussed bail, we're going to

7    wait for the -- we're not going to ask for bail now until after

8    the Second Circuit has resolved the matter before Judge Castel.

9    So with that in mind, we would have no objection to a late

10   October or early November date.

11         THE COURT:  Why don't we put it off for November 4.

12         Do you want to do it at 9:00 a.m.?  It's a Friday.

13   9:00 a.m. on November 4.  Does that work for everyone?

14         MS. HECTOR:  Your Honor, that's generally fine.  I

15   think, assuming that Jason Galanis will still be in custody at

16   that time -- I assume he will be -- the marshals may have

17   trouble being here by 9:00.

18         THE COURT:  I'm on trial that day.  I can put it on

19   for 1:00 that day.

20         MS. HECTOR:  Great.

21         THE COURT:  So 1:00 on November 4.  As I said, at that

22   time, I am going to set a motion schedule and a trial date.  So

23   you just need to be in a position to do that.  You don't need

24   to know exactly which motions you intend to make, but you have

25   to have enough of a sense to weigh in on timing.  So I hope

1    that's clear.

2          Does the government seek to exclude time under the

3    Speedy Trial Act?

4          MS. HECTOR:  We do, your Honor, to allow the

5    defendants to review the voluminous discovery in this case and

6    to begin to consider any motions they may wish to make.

7          THE COURT:  Any objection?  So I will exclude time

8    from today until November 4 pursuant to 18 U.S. Code, Section

9    3161(h)(7)(A).  I find that the ends of justice served by

10   excluding such time outweigh the interests of the public and

11   the defendants in a speedy trial because it will allow the

12   defendants and counsel to review discovery and consider any

13   motions they'd like to make.

14          Are there any other issues we need to discuss today?

15          MS. HECTOR:  I don't think so, your Honor.  Just a

16   very general heads-up, I guess, which is the government

17   returned a very sort of statutory charging indictment in this

18   case because one of the defendants declined to waive until the

19   30th day.

20          As a result, we anticipate returning a superseding

21   indictment in the near future that will that will just set

22   forth the case in more detail.  I don't expect at this time

23   that it will change the charges or otherwise alter the

24   landscape.  But we'll, of course, send a copy to your Honor

25   when that's done, and then the defendants can be arraigned at

 1    that time.

 2         THE COURT:  Do you have any sense of timing on the

 3    superseder?

 4         MS. HECTOR:  I think it will come in the next weeks

 5    probably, not more than a month or so from now.  It will be

 6    long before anything is done.

 7         THE COURT:  Defendants are on notice of that.

 8         Now, with respect to Mr. Galanis and Mr. Dunkerley, I

 9    understand that Ms. Brune and Mr. Witzel are just here for bail

10    purposes only.

11         Is there anything the Court needs to set all with

12    respect to substitution of counsel?

13         MS. BRUNE:  Not at this time, your Honor, because it's

14    not clear exactly how we're going to resolve it.  If it's all

15    right, may we be in touch with your deputy?

16         THE COURT:  Yes.  If you could do that or just write a

17    letter to the Court.  So just let me know if we need any

18    further proceedings.

19         MR. WITZEL:  The same for Mr. Galanis.  As the Court

20    is aware, there is the other case before Judge Castel.  There

21    is a substantial bail package, including $3,000,000 of

22    collateral.  We respectfully submit that would be adequate

23    here.

24         Until that matter is resolved by the Second Circuit,

25    we reserve the right to come back and make a bail argument, and

1    we'll be in touch with chambers when that moment ripens.

2              THE COURT:  All right.  Understood.

3              Are there any other applications at this time?  All

4    right.

5              One moment, please.

6              (Pause)

7              MS. HECTOR:  The two defendants for whom bail was

8    first set today have to sign the bond in the magistrate's

9    clerk's office.  So they should be directed to go to the fifth

10   floor.

11             THE COURT:  That's what we were just discussing.  We

12   were discussing the paperwork to be sure they are in a position

13   to sign those bonds today.  We'll get out the paperwork that we

14   need to get out shortly.

15             MS. HECTOR:  Thank you, your Honor.

16             THE COURT:  Thank you.  We're adjourned.

17             (Adjourned)

18

19

20

21

22

23

24

25

# Exhibit B

| From: | Brown, Nancy A <BrownN@SEC.GOV> |
| Sent: | Tuesday, December 5, 2017 4:36 PM |
| To: | Matthew L. Schwartz |
| Cc: | Shah, Tejal |
| Subject: | RE: SEC v Archer |

Matt,
Our IT staff estimates that a hard drive of at least 1.5 terabytes should accommodate a production of the Intel emails.

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Monday, December 04, 2017 4:53 PM
**To:** Brown, Nancy A; David Nelson
**Cc:** Shah, Tejal
**Subject:** RE: SEC v Archer

OK. What size would we need for the Intel emails?

**From:** Brown, Nancy A [mailto:BrownN@SEC.GOV]
**Sent:** Monday, December 4, 2017 4:30 PM
**To:** Matthew L. Schwartz; David Nelson
**Cc:** Shah, Tejal
**Subject:** RE: SEC v Archer

As we've discussed, I can tell you what size hard drive you'd need for the Intel emails, but for the other material, your IT vendor will have to work with our IT people to figure out logistics for imaging of the various media we have. The 40 or so boxes of documents are not digitized, so we will have to arrange either their copying or some time for your to come review them in our offices.
Let me know how you'd like to proceed.

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Monday, December 04, 2017 4:26 PM
**To:** Brown, Nancy A; David Nelson
**Cc:** Shah, Tejal
**Subject:** RE: SEC v Archer

What size drive would I need to give you to get the "AAM Materials"?

**From:** Brown, Nancy A [mailto:BrownN@SEC.GOV]
**Sent:** Monday, December 4, 2017 4:13 PM
**To:** Matthew L. Schwartz; David Nelson
**Cc:** Shah, Tejal
**Subject:** RE: SEC v Archer

Matt,
That is correct. The production will not include those materials. As we've discussed, we will not divulge what we have shared with the USAO.
Thank you.

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Monday, December 04, 2017 11:48 AM
**To:** Brown, Nancy A; David Nelson
**Cc:** Shah, Tejal
**Subject:** RE: SEC v Archer

Nancy –

With respect to the "AAM materials," I assume you are referring to the materials described in your November 27 e-mail to me as:

- Approximately 40 boxes of documents stored by AAM Alexandria and Stamford offices
- Servers, back up tapes collected from AAM by Receiver from AAM offices in Alexandria and Stamford
- Assorted materials collected by Receiver from AAM Alexandria and Stamford offices. Includes selected documents obtained by Receiver; additional hard drives from Alexandria and Kansas City (old); back up external harddrive of Stamford server; Daniel Turney's back up external harddrive from Alexandria; keys, id cards and employee phones (excluding Morton's); Hughes 2013 tax return; Service providers contracts; quick books data
- Emails from Intel (ISP for AAM Stamford).
- Quickbooks for AAM
- 55 Desktop harddrives; 7 laptops and 10 other devices

We asked you whether this was information that had previously been produced to us by the USAO. You instructed me to ask that question of the USAO, as you were not in a position to tell us what they had produced. However, the USAO has now refused to answer the question, on the theory that doing so would somehow reveal its "litigation strategy." Can you tell me whether the above is information that the SEC has previously shared with the USAO? As you know, all I am trying to do for present purposes is figure out whether that material is stuff we already have, or whether it's unique. Thanks.

-mls

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

---

**From:** Brown, Nancy A [mailto:BrownN@SEC.GOV]
**Sent:** Monday, December 4, 2017 11:09 AM
**To:** Matthew L. Schwartz; David Nelson
**Cc:** Shah, Tejal
**Subject:** SEC v Archer

Matt and Dave,
Please provide an 80GB hard drive for our further production. As we've discussed, it will not include the AAM materials we have previously offered and described to you. Thank you.

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

# Exhibit C

| From: | Matthew L. Schwartz |
|---|---|
| Sent: | Monday, November 27, 2017 1:04 PM |
| To: | Mermelstein, Rebecca (USANYS); Quigley, Brendan (USANYS); Tekeei, Negar (USANYS); Brian R. .Blais (Brian.Blais@usdoj.gov); Griswold, Andrea (USANYS) |
| Subject: | U.S. v. Galanis discovery question |

Rebecca, et al. –

We received from the SEC this morning the below list of materials collected by the AAM receiver from various AAM locations. The SEC has offered to make this material available to us in discovery, but directed us to you when I asked whether any of this had already been produced as discovery in the criminal case. Can you please let me know if the government has reviewed and/or produced any of the below? Thanks.

- Approximately 40 boxes of documents stored by AAM Alexandria and Stamford offices
- Servers, back up tapes collected from AAM by Receiver from AAM offices in Alexandria and Stamford
- Assorted materials collected by Receiver from AAM Alexandria and Stamford offices. Includes selected documents obtained by Receiver; additional hard drives from Alexandria and Kansas City (old); back up external harddrive of Stamford server; Daniel Turney's back up external harddrive from Alexandria; keys, id cards and employee phones (excluding Morton's); Hughes 2013 tax return; Service providers contracts; quick books data
- Emails from Intel (ISP for AAM Stamford).
- Quickbooks for AAM
- 55 Desktop harddrives; 7 laptops and 10 other devices

# Exhibit D

| | |
|---|---|
| From: | Matthew L. Schwartz |
| Sent: | Thursday, December 7, 2017 6:04 PM |
| To: | Mermelstein, Rebecca (USANYS) |
| Cc: | Quigley, Brendan (USANYS); Tekeei, Negar (USANYS) |
| Subject: | RE: Govt Production # 16 |

Rebecca –

1. Yes, thanks, a copy of cover letters/transmission e-mails would be very helpful.

2. If you expect an answer on the remaining issues shortly, then we're fine to wait and get everything at once. Just so it doesn't get lost, let's say if you don't get an answer or reasonably expect one by next week, just go ahead and send us what you have.

3. I understand your position, but I would have thought you or the SEC could provide an answer to my logistical question. This does not involve your litigation strategy, because the answer is knowable by me: I can get the documents from the SEC and compare them to the criminal discovery, it will just entail a lot of extra time and expense. I would ask you to reconsider your position.

-mls

From: Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
Sent: Monday, December 4, 2017 11:30 AM
To: Matthew L. Schwartz
Cc: Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
Subject: RE: Govt Production # 16

Matt,

To respond in reverse order:

1) We don't have a simple tracking spreadsheet that is in a form that can be shared. We could easily resend you all of the cover letters if that would help. Otherwise, I'm happy for you to clean up your spreadsheet so we can take a look or to run through it all on the phone.

2) We have gotten answers to some, but not all of the metadata answers and are working on addressing the remaining issues. To be more specific, we have identified an overlay that corrects the delimiter issue but our third party vendor does not have data for accessed date/time, internet message id, or intfilepat. We are working to see if that can be extracted and provided and will keep you posted. If you would like the delimiter overlay in the meantime I'm happy to send it (I thought it would be easier to make one metadata production, but whatever you prefer is fine).

3) I strongly disagree that the SEC and USAO have jointly investigated this matter. To the contrary, we have conducted independent parallel investigations in which, to be sure, documents have been shared upon request. We are sending out an additional production today (cover letter attached) which produces additional materials we received from the SEC by request. This may provide you with some understanding of what has been received from the SEC. Beyond that, I do not believe it is appropriate to ask the Government to reveal its litigation strategy by identifying which documents have been requested from the SEC. As I said, the SEC and USAO matters are wholly separate and – having elected to proceed with discovery in both cases simultaneously

– you need to deal with the SEC with respect to discovery in its case and with us with respect to the criminal prosecution.

Best,

Rebecca

---

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Saturday, December 2, 2017 2:48 PM
**To:** Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>
**Cc:** Quigley, Brendan (USANYS) <BQuigley@usa.doj.gov>; Tekeei, Negar (USANYS) <NTekeei@usa.doj.gov>
**Subject:** RE: Govt Production # 16

Rebecca –

Putting aside the question of whether the government is responsible for reviewing information in the SEC's possession, I am asking a logistical question that the SEC directed me to address to you: Is the material that they listed below material that you have already produced to us in criminal discovery? If the answer is yes, I don't want to receive it again and have to incur significant expense mounting, reviewing, and de-duping it; if the answer is no, I will make sure I get it from the SEC.

The SEC doesn't want to tell me what they've given the USAO, and you don't want to make representations about the SEC, but the result shouldn't be that Mr. Archer has to pay an extraordinary amount of money to re-review material that may have already been produced when the SEC and USAO have unquestionably investigated jointly and are sharing information and evidence with one another. Indeed, you will recall that one reason that we had a disagreement about the scope of the confidentiality order in this case (before Judge Abrams' ruling on our motion regarding the SW) was that you said you could not be restricted from sharing information with the SEC.

Can't you and Nancy talk to one another and one of you give me the factual answer to the question of whether the stuff she listed is the same as stuff you've already produced, or whether it's different? This would be a silly thing to have to go to Judge Abrams and/or Judge Pauley with.

Also, please let me know if (a) you've found out anything about the missing metadata, and (b) you have a simply tracking spreadsheet of your prior productions so we can compare to what we've received. Thanks.

-mls

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)

---

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Wednesday, November 29, 2017 3:37 PM
**To:** Matthew L. Schwartz
**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** RE: Govt Production # 16

No problem.

With respect to your other question, we have produced the Rule 16 material in our possession to date, including any materials received from the SEC, and will continue to produce any additional materials we receive in a timely fashion. We are not in a position to make representations concerning materials being made available to you by the SEC in civil discovery.

Best,

Rebecca

---

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Wednesday, November 29, 2017 2:44 PM
**To:** Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>
**Cc:** Quigley, Brendan (USANYS) <BQuigley@usa.doj.gov>; Tekeei, Negar (USANYS) <NTekeei@usa.doj.gov>
**Subject:** RE: Govt Production # 16

Thank you. And when you get a chance, please also let me know about those items the SEC referred us to you on, so that we can get back to them.

-mls

---

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Wednesday, November 29, 2017 2:01 PM
**To:** Matthew L. Schwartz
**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** RE: Govt Production # 16

I'll look into it and get back to you shortly.

---

**From:** Matthew L. Schwartz [mailto:mlschwartz@BSFLLP.com]
**Sent:** Wednesday, November 29, 2017 1:33 PM
**To:** Mermelstein, Rebecca (USANYS) <RMermelstein@usa.doj.gov>
**Cc:** Quigley, Brendan (USANYS) <BQuigley@usa.doj.gov>; Tekeei, Negar (USANYS) <NTekeei@usa.doj.gov>
**Subject:** RE: Govt Production # 16

We have now heard back from our vendor. The file you provided solved some, but not all, of the problems.

Most importantly, while a number of fields were filled in by the file you provided, several were not including
- Date Accessed – Date
- Date Accessed – Time
- Email – Internet Message ID
- Int File Path

The first two of these in particular are potentially highly important, and we know this metadata to be included in the files because, again, it was in the exact same documents when we produced them to the government.

Also, the metadata was corrupted with respect to certain documents. Specifically, I understand that there were 10 corrupted line items in the overlay provided to us that had incomplete bates numbers and corrupt delimiters:

| Error lines in original overlay file | Production::Begin Bates |
| --- | --- |
| 331 | SearchWarrant_v2_00018930 |

| 2442 | SearchWarrant_v2_00020976 |
| 2443 | SearchWarrant_v2_00020977 |
| 2444 | SearchWarrant_v2_00020978 |
| 3904 | SearchWarrant_v2_00021778 |
| 5145 | SearchWarrant_v2_00023131 |
| 8032 | SearchWarrant_v2_00025007 |
| 8033 | SearchWarrant_v2_00025008 |
| 8086 | SearchWarrant_v2_00025009 |
| 8087 | SearchWarrant_v2_00025010 |

Could you please provide the missing data?  Thanks.

-mls


Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
212-303-3646 (Direct)
646-337-5787 (Mobile)


**From:** Matthew L. Schwartz
**Sent:** Tuesday, November 28, 2017 11:50 AM
**To:** 'Mermelstein, Rebecca (USANYS)'
**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** RE: Govt Production # 16

Thanks, this was received.  We are sending it to the vendor now and will let you know if there are any remaining questions.

Regarding past productions, we have a tracking sheet but it contains all sorts of work product.  If you have a simple list that you wouldn't mind sharing it would save my client the expense of us reformatting our spreadsheet.  If you don't have such a list, we'll send you what we have -- although I assume you would need to have a good tracking system to be able to confirm that we have it all.

-mls

**From:** Mermelstein, Rebecca (USANYS) [mailto:Rebecca.Mermelstein@usdoj.gov]
**Sent:** Monday, November 27, 2017 3:42 PM
**To:** Matthew L. Schwartz
**Cc:** Quigley, Brendan (USANYS); Tekeei, Negar (USANYS)
**Subject:** [Not Virus Scanned] [Not Virus Scanned] FW: Govt Production # 16

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Matt,

Per your request, I am resending the October 20th metadata overlay.  Please confirm it has come through.  If you want to send us a list of what you have received to date in discovery we're happy to double check to make sure you have received everything that has gone out.

Best,

Rebecca


Dear Counsel,

Attached to this e-mail, you will find Production 16 and a corresponding cover letter pertaining to US v. Jason Galanis et al.

Please let me know if you have any issues accessing the data.

Best,

Christine Lee
Paralegal Specialist
U.S. Attorney's Office SDNY
One Saint Andrews Plaza,
New York, NY 10007
Tel: 212-637-2272
Email: Christine.Lee@usdoj.gov


The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]

The information contained in this electronic message is confidential information intended only for the use of the named recipient(s) and may contain information that, among other protections, is the subject of attorney-client privilege, attorney work product or exempt from disclosure under applicable law. If the reader of this electronic message is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, you are hereby notified that any dissemination, distribution, copying or other use of this communication is strictly prohibited and no privilege is waived. If you have received this communication in error, please immediately notify the sender by replying to this electronic message and then deleting this electronic message from your computer. [v.1]